HOWARD RANDOLPH, Individually and as Administrator of the
Estate of BESSIE RANDOLPH, Deceased, Respondent, v CITY
OF NEW YORK et al., Appellants, et al., Defendants.

First Department, May 8, 1986

### APPEARANCES OF COUNSEL

*Paul F. McAloon* of counsel *(Fuchsberg & Fuchsberg,* attorneys), for respondent.

*Alfred Weinstein* of counsel *(Leonard Koerner* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for appellants.

### OPINION OF THE COURT

Ross, J.

In this appeal, the court is faced with the unfortunate dilemma that occurs when there is a direct conflict between a party's religious beliefs, and the medical technique required to save that party's life.

The issue presented is whether, in this wrongful death action, there is sufficient evidence of the negligence of the defendants, the City of New York (City), the New York Health and Hospitals Corporation (Health and Hospitals), and Dr. Elmer S. Foster (Dr. Foster), to support the jury verdict in favor of the plaintiff and against these defendants.

Plaintiff Howard Randolph (Mr. Randolph), who was a police officer, married Bessie Randolph (Mrs. Randolph), in July 1963. Between 1963 and 1974, Mrs. Randolph underwent at least two miscarriages and gave birth, all by Caesarean section, to three male children. Sometime late in 1974, Mrs. Randolph again became pregnant. Throughout the period of this pregnancy, Mrs. Randolph received prenatal care from Dr. Michael R. Cehelsky (Dr. Cehelsky), who was an obstetrician-gynecologist, at the Upper Manhattan Medical Group (Upper Manhattan), which is located in New York County.

Prior to the time that Mrs. Randolph entered the hospital to

deliver, by Caesarean section, her fourth child, and to be sterilized by a tubal ligation, Dr. Cehelsky specifically informed her that on occasion, in connection with a Caesarean section, blood transfusions are necessary to save the woman's life. It is undisputed that, in response to this statement of Dr. Cehelsky, Mrs. Randolph competently and unequivocally advised him that, in view of the fact that she was a Jehovah's Witness, blood transfusions were not to be administered to her under any circumstances.

Subsequently, on July 16, 1975, Mrs. Randolph was admitted to Sydenham Hospital (Sydenham), located in New York County, as Dr. Cehelsky's private patient. In 1975, the City owned Sydenham and Health and Hospitals operated, maintained and controlled it. A notation appears in Sydenham's admission records that Mrs. Randolph was a Jehovah's Witness and did not wish to receive a blood transfusion.

The members of Jehovah's Witnesses have a fundamental belief "that blood transfusions are a violation of the law of God, and that transgressors will be punished by God" (*In re Brooks' Estate*, 32 Ill 2d 361, 362, 205 NE2d 435, 436 [Sup Ct, Ill 1965]), since they will be denied "everlasting life" (*In re Osborne*, 294 A2d 372, 373 [DC App 1972]).

Shortly after her admission, Mrs. Randolph, who was then 45 years old, 5 foot 4 inches tall, and weighed in excess of 200 pounds, in preparation for surgery, was subjected to a number of blood tests. The results of these tests indicated that Mrs. Randolph had borderline anemia, which meant that the loss of blood to a person in her condition would be more dangerous than it would be to a person who was not anemic. Furthermore, it was estimated by the Sydenham medical staff that for a woman of her size and weight, Mrs. Randolph had a total blood volume of between 5,000 and 5,500 cubic centimeters (cc) (note: one quart of blood is equal to approximately 1,000 cc). Pursuant to Sydenham's routine preparation for surgery, Mrs. Randolph's blood was cross-matched, and two units of compatible blood, of which one unit contained whole blood and the other unit contained packed blood (note: each unit is equivalent to 500 cc of blood), were sent to the operating room in advance of the surgery.

On the morning of July 17, 1975, Mrs. Randolph was taken to the operating room. Among the medical personnel in that room was Dr. Foster, who was employed by Health and Hospitals in the capacity of director of anesthesiology at

Sydenham, and who was assigned to administer the anesthesia to Mrs. Randolph. As the anesthesiologist, Dr. Foster, besides providing the anesthesia, also was responsible for monitoring Mrs. Randolph's life support systems and supervising the administration of all fluids into her body, including blood.

Thereafter, Dr. Cehelsky performed a Caesarean section, and delivered a full-term normal baby girl at approximately 11:43 A.M. that day. However, Dr. Cehelsky encountered a serious problem as he tried to remove the placenta, since he found Mrs. Randolph was suffering from a condition medically known as placenta previa and placenta accreta. Placenta previa indicates that the placenta has grown over the opening into the uterus, and placenta accreta indicates that the placenta has grown into the wall of the uterus, so that it cannot be detached without removing the uterus. In order to remove the uterus, Dr. Cehelsky proceeded to perform a hysterectomy. While Dr. Cehelsky was carrying out that emergency procedure, a 1 to 2 centimeter laceration was inflicted in the urinary bladder, which caused a massive hemorrhage. By 12:00 noon, Mrs. Randolph had lost approximately 2,000 cc of blood, or about 40% of her blood supply.

According to Dr. Foster, considering the amount of blood she had lost, he would have initiated a transfusion of blood at noon, if Mrs. Randolph had not forbidden him to do so because she was, as mentioned *supra,* a Jehovah's Witness. Due to this constraint imposed by Mrs. Randolph, Dr. Foster tried to deal with the situation by transfusing her with a crystalloid solution, consisting of dextrose and Ringer's Lactate, so as to maintain her circulatory volume and give her a fluid substitute to compensate for the blood loss. Unfortunately, this technique did not prevent Mrs. Randolph from continuing to lose blood, as a result of the hemorrhage.

By 12:30 P.M., Dr. Foster became very concerned because Mrs. Randolph had by this time lost about 80% of her blood, and there was no evidence that the hemorrhage was being brought under control. In response to these facts, Dr. Foster asked someone in the operating room to contact the City Corporation Counsel and the Jehovah Witness Council for authorization to proceed with a blood transfusion. Nearly 15 minutes later, Dr. Foster was informed that the Corporation Counsel had given authorization for such a transfusion, and at 12:45 P.M. he began transfusing Mrs. Randolph with blood. Incidentally, the telephone call to the Jehovah Witness Council resulted in the message, "Call back after 1:00 P.M.".

It is important to note at this time that the Trial Justice specifically charged "You are not to consider the failure of the defendants to transfuse Bessie Randolph until 12:45 P.M. on July 17, 1975, as an act of negligence." We agree.

Even though the deceased was now receiving a blood transfusion, the rate of the hemorrhage was not controlled until slightly after 1:00 P.M. At approximately 1:15 P.M., Mrs. Randolph suffered cardiac arrest. Her chest was opened and the heart massaged. Despite these efforts, she was declared dead at 2:00 P.M.

The autopsy report attributes the cause of death to: "Massive hemorrhage during hysterectomy for placenta acreta *[sic]* discovered at term elective Caesarean section delivery. Laceration of urinary bladder."

Following the death of his wife, Mr. Randolph commenced two wrongful death actions, which were later consolidated. These actions were based upon the alleged medical malpractice of Doctors Cehelsky and Foster. Named as defendants in these actions, in addition to the doctors, were Upper Manhattan, the City and Health and Hospitals. In advance of trial, plaintiff settled with defendants Upper Manhattan and Dr. Cehelsky for $350,000. In view of this settlement, the case proceeded to trial only against defendants the City, Health and Hospitals and Dr. Foster. Consequently, the only issue at trial was the alleged negligence of Dr. Foster, and through him, that of the City and Health and Hospitals.

At trial, in substance, the positions of the parties were as follows: On the one hand, plaintiff contended that the defendants were liable for Mrs. Randolph's death, since Dr. Foster: (1) did not immediately begin a blood transfusion after Mrs. Randolph began to hemorrhage, even though she had refused to consent to receive blood on religious grounds; and (2) after he received authorization to transfuse Mrs. Randolph, he allegedly performed same negligently. However, on the other hand, the defendants contended that Mrs. Randolph's death was attributable to Dr. Cehelsky's negligence; and, that by the time that Dr. Foster received authorization to transfuse Mrs. Randolph, it was too late to save her life. Each side presented expert medical testimony, and defendant Dr. Foster was called as a witness by the plaintiff.

Before they retired to deliberate, the trial court instructed the jury that: "as a matter of law, I charge you that you are not to consider the failure of the defendants to transfuse

Bessie Randolph until 12:45 P.M. on July 17, 1975, as an act of negligence". Furthermore, the trial court submitted to the jury, as issues of fact, whether Dr. Foster had negligently transfused Mrs. Randolph after 12:45 P.M., and, if a negligent transfusion had been given, whether such negligence was the proximate cause of Mrs. Randolph's death.

Following deliberation, the jury returned a verdict in plaintiff's favor in the amount of $2,500,000, and found the percentage of fault attributable to these defendants to be 50%. Also, the jury found Dr. Cehelsky to be 50% liable, but since plaintiff, as mentioned *supra,* had settled with Dr. Cehelsky before trial, pursuant to General Obligations Law § 15-108, he was released from any contribution claim. Subsequent to the verdict, defendants moved to set aside the verdict, upon the grounds that: (1) it was against the weight of evidence; and (2) it was excessive. The trial court granted that motion only insofar as to direct a new trial on the issue of damages, unless plaintiff stipulated to a reduction of the award to $1,000,000, and the plaintiff so stipulated.

At oral argument before us, plaintiff's counsel conceded that the defendants would not have been liable, if Dr. Foster had not undertaken to transfuse Mrs. Randolph, since he would have been merely following her instructions. We agree with this position. Under the law of New York, competent adults can limit the medical care to be given to them. In the case of *Matter of Storar* (52 NY2d 363 [1981]), now Chief Judge Wachtler of the Court of Appeals stated for the court, in pertinent part (at p 377), that: "In this State * * * there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring the patient's decision. To the extent that existing statutory and decisional law manifests the State's interest on this subject, they consistently support the right of the competent adult to make his own decision by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient's life (see, e.g., *Schloendorff v Society of N.Y. Hosp.,* 211 NY 125 * * * *Matter of Erickson v Dilgard,* 44 Misc 2d 27; *Matter of Melideo,* 88 Misc 2d 974; Public Health Law, §§ 2504, 2805-d; CPLR 4401-a)."

Public Health Law §§ 2504 and 2805-d specifically provide that a patient has a right to determine his own medical treatment and that right is superior to the physician's duty to provide necessary care. The respondents' argument that the

defendant Dr. Foster was required to ignore Mrs. Randolph's religious belief against blood transfusions, to assure support for her children, is without merit. The State's interest in assuring parental support is satisfied where there is a capable surviving parent.

It is hornbook law that liability can only attach to the defendants if their alleged negligence was the proximate cause of Mrs. Randolph's death *(Ventricelli v Kinney Sys. Rent A Car,* 45 NY2d 950, 951-952 [1978]; *see also, Sheehan v City of New York,* 40 NY2d 496, 501 [1976]; and *Rivera v City of New York,* 11 NY2d 856, 857 [1962]). In the instant case, proximate cause means that the plaintiff must present sufficient evidence to support the reasonable inference that Mrs. Randolph's death resulted as a natural and probable consequence of the blood transfusion given by Dr. Foster *(Saugerties Bank v Delaware & Hudson Co.,* 236 NY 425, 430 [1923]; *Bolsenbroek v Tulley & Di Napoli,* 10 NY2d 960 [1961], *affg* 12 AD2d 376 [1st Dept 1961]; *Gralton v Oliver,* 302 NY 864 [1951], *affg* 277 App Div 449 [1950]; *Becker v Schwartz,* 46 NY2d 401, 410-411 [1978]; Prosser, Torts § 42, at 244-249 [4th ed]).

The trial court came to the conclusion that sufficient evidence was submitted to support the jury's verdict. Our reading of the record compels the conclusion that the trial court erred.

Unless the connection between the transfusion and Mrs. Randolph's death is clearly visible to the jury, "expert medical opinion testimony is required to establish proximate cause and make out a prima facie case of medical malpractice" *(Monahan v Weichert,* 82 AD2d 102, 107 [1981]; *Mortensen v Memorial Hosp.,* 105 AD2d 151 [1st Dept 1984]). Since we find that the relationship between Mrs. Randolph's death and the blood transfusion was not readily apparent, expert medical testimony was necessary to furnish the linkage.

The plaintiff relied upon the testimony of both Dr. Sidney Nearenberg (Dr. Nearenberg), and defendant Dr. Foster to raise the inference that decedent's life could have been saved, if defendant Dr. Foster had administered a negligence-free blood transfusion, even though it began as late as 12:45 P.M., at a time when decedent had already sustained a loss of more than three quarters of her blood supply.

Even though Dr. Nearenberg, who was the plaintiff's expert in anesthesiology, testified that, in his opinion, defendant Dr. Foster infused too little blood at too slow a rate after 12:45 P.M., he conceded that, also in his opinion, by 12:30 P.M.,

approximately 15 minutes *before* the transfusion began, Mrs. Randolph's condition had become irreversible and she could no longer be rescued, regardless of what steps were taken.

In fact, in reply to the question:

"In this case, at what time was it a matter of life as opposed to death when these things should have been done for her?"

Dr. Nearenberg, the plaintiff's expert, answered:

"Well, the correct steps should have been taken *before 12 o'clock noon.*" (Emphasis supplied.)

Dr. Foster testified that, although by the time he began the blood transfusion, decedent had "probably lost almost her entire blood supply", he still "hoped" to save her. However, in contradiction of Dr. Foster's "hope", he acknowledged, at his examination before trial, that, in order for Mrs. Randolph to have survived, she would have had to begin receiving blood no later than 12:30 P.M. Our examination of the entire testimony of Dr. Foster leads us to conclude that his testimony that he hoped to save decedent's life was a prayer, rather than a professional opinion. Over 30 years ago, this court unanimously held in *Strasberg v Equitable Life Assur. Socy.* (281 App Div 9, 13 [1st Dept 1952]) that "[w]ords put in the form of an opinion uttered by a witness, even though he be an expert, cannot create an issue of fact when the factual basis for the opinion does not sustain his conclusion". We can understand Dr. Foster's frustration, in view of the fact that he was required to stand helplessly by, while Mrs. Randolph bled to death, as a result of her religious beliefs. This is particularly so, since he obviously had the skill and the means to properly transfuse her, and probably save her life, had he been permitted to do so, when first indicated.

The defendants also produced a medical expert, who was Dr. David H. Sherman (Dr. Sherman), and his specialty was obstetrics. Dr. Sherman testified, in pertinent part, that, in his opinion, Mrs. Randolph's life could only have been saved if she received blood no later than 12:15 P.M., since "by noon, 17 minutes after the baby was born, she lost almost half of the blood in her body and clearly within the next ten or fifteen minutes, she lost more than half the blood in her body and nobody can live like that. She died because of that".

After our review of the record, we find that the overwhelming medical evidence, as a matter of law, failed to support the inference that Mrs. Randolph could have survived, even if she received a proper blood transfusion at 12:45 P.M. Therefore,

there was no issue of fact on which the jury could deliberate. We find applicable to the instant case, the following holding we made in *Sumner v Extebank* (88 AD2d 887, 889 [1st Dept 1982]), "the jury's verdict [of liability against the defendants] could not have been reached upon any fair interpretation of the evidence. *(Szabo v Super Operating Corp.,* 51 AD2d 466; 4 Weinstein-Korn-Miller, NY Civ Prac, par 4404.09; *McDowell v DiPronio,* 52 AD2d 749.)"

The expert witnesses for both sides agreed that Mrs. Randolph's life was "forfeited" due to irreversible shock, possibly as early as 12:30 P.M., and given the court's charge, and we agree, that there could be no liability against Dr. Foster for failing to act prior to 12:45 P.M., we come to the inevitable conclusion that there could be no malpractice by Dr. Foster, as a matter of law, and as a matter of fact.

Considering the facts of this case, where Mrs. Randolph was doomed to die before Dr. Foster began his rescue effort at 12:45 P.M., we find inapplicable "[t]he case law * * * that, even when no original duty is owed to the plaintiff to undertake affirmative action, once it is voluntarily undertaken, it must be performed with due care *(Marks v Nambil Realty Co.,* 245 NY 256, 258; *Glanzer v Shepard,* 233 NY 236, 239; *Zelenko v Gimbel Bros.,* 158 Misc 904, *affd* 247 App Div 867)" *(Parvi v City of Kingston,* 41 NY2d 553, 559 [1977]). The reason for this finding is that regardless of the care, or lack of care, with which the blood transfusion was performed, it was too late to save the decedent's life.

To this writer, to require a physician to stand by helplessly, while a patient is dying, and, when it is too late to save the patient, the doctor is instructed to proceed to use his skills to save her, and, to then attempt to apply liability for his actions, is just unacceptable.

Plaintiff moved in this court (M-6551) to dismiss the appeal of the defendant City, upon the ground that the City's notice of appeal (notice) was defective. We have examined the City's notice, and find it valid (CPLR 5520 [c]). Therefore, we denied that motion.

We find that the trial court erred in submitting the question of liability against the City of New York to the jury. There is nothing in the record to indicate that the Corporation Counsel had any duty to Mrs. Randolph, or that there was any breach of any duty that was the proximate cause of her death.

Accordingly, the judgment, Supreme Court, New York

County (Eugene P. Bambrick, J.), entered November 9, 1984, after a jury trial, which, *inter alia,* is in favor of the plaintiff and against defendants the City of New York (City), the New York Health and Hospitals Corporation (Health and Hospitals), and Elmer S. Foster (Foster), in the amount of $500,000. (The jury verdict was initially $2,500,000; the trial court reduced it to $1,000,000 upon a posttrial motion to set aside the verdict; the final award of $500,000 was based upon the jury finding that the defendants City, Health and Hospitals and Foster were 50% liable), should be reversed, on the law and the facts, the judgment vacated and the complaint dismissed, without costs.

ELLERIN, J. (dissenting). There was sufficient proof in the record, upon which the jury could rely, to find that when the defendant Dr. Elmer Foster undertook to transfuse Bessie Randolph at 12:45 P.M. on July 17, 1975, Mrs. Randolph could have been saved. There was also sufficient proof that Dr. Foster was negligent in performing the acts he took at that time, and that such negligence was one of the proximate causes of Mrs. Randolph's death. A jury verdict should be set aside only when "the verdict seems palpably wrong and it can be plainly seen that the preponderance is so great that the jury could not have reached their conclusion upon 'any fair interpretation of the evidence.' " (4 Weinstein-Korn-Miller, NY Civ Prac ¶ 4404.09.) "For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence, however, requires a harsher and more basic assessment of the jury verdict. It is necessary to first conclude that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial." *(Cohen v Hallmark Cards,* 45 NY2d 493, 499.) Based on this standard, the jury verdict in favor of the plaintiff on the issue of the liability of Dr. Foster should not be set aside.

The background facts are thoroughly set forth in the majority opinion. However, the facts that are most crucial to our analysis here are those that relate to the treatment of Mrs. Randolph in the operating room at 12:45 P.M. and thereafter. The trial court, after thoughtful consideration of the ethical issues of Mrs. Randolph's religious values, charged the jury expressly that it was not to consider the failure to transfuse Mrs. Randolph before 12:45 P.M., and that it must find in favor

of the defendants if at 12:45 P.M. her life could not be saved. The court instructed the jury to hold Dr. Foster liable only "if you find that on July 17, 1975 at 12:45 PM, when Dr. Foster voluntarily undertook to transfuse Bessie Randolph, she could have been saved at that time and that the defendants acted in a negligent manner at that time, you may find against the defendants, if their negligent acts were a proximate cause of Bessie Randolph's death."

The majority relies heavily on the expert testimony in concluding that Mrs. Randolph's condition was irreversible and her life "forfeited" before 12:45 P.M. and that no steps taken at that time could have saved her. However, the "opinions" of these witnesses, relied on by the majority, were mere isolated "single answers" rather than the totality of the testimony (Matott v Ward, 48 NY2d 455, 462-463) and were contradicted by other answers given by the same witnesses. Moreover, the objective facts testified to by these witnesses, upon which their opinions were based, provided a sufficient basis for the jury to find that Mrs. Randolph's condition was not yet irreversible as of 12:45 P.M.

The treating anesthesiologist, the defendant Dr. Foster, testified as to his treatment of Mrs. Randolph and read her anesthesia record at trial. The decedent's blood pressure prior to surgery was well within the normal range, with a systolic reading of 120 and diastolic reading of 70. Her systolic pressure rose to 125 at noon, drifted to 100 and slightly below from 12:05 P.M. to 12:20 P.M. and measured 95 at 12:25 P.M. It settled at "just below 90, well above 80" from 12:25 P.M. through 12:50 P.M. At the same time, Mrs. Randolph's diastolic pressure remained at approximately 70 from 12:05 P.M. through 12:45 P.M. Thus, according to Dr. Foster, Mrs. Randolph's blood pressure remained in the normal range for adult females and well above the point where irreversible shock would set in. Her blood pressure remained about the same from a little after noon to 1:00 P.M.

Prior to surgery, Mrs. Randolph's pulse was between 80 and 90. It rose steadily throughout the operation, due to the rapid loss of blood, and reached 120 shortly after 12:00 P.M. But the pulse remained at that level from that point on until after 1:00 P.M. and, as Dr. Foster testified, never exceeded any rate which would be considered normal until the time she went into cardiac arrest at 1:15 P.M.

Dr. Foster also testified that the patient's vital signs were

still satisfactory at the time he began preparing for the transfusion. It was based on this factual data, and not any fleeting "hope" or "prayer", that Dr. Foster stated that "he still hoped to save her".

The plaintiff's expert, Dr. Nearenberg, also testified that Mrs. Randolph could have been saved if proper measures were taken after 12:45 P.M. Relying on the data as shown in the decedent's medical records, Dr. Nearenberg testified that she did not go into irreversible shock until sometime after 12:45 P.M. He pointed out that the patient possessed a very strong heart, which was still beating until 1:15 P.M. He, too, noted that her vital signs of blood pressure and pulse were still viable at the crucial time of 12:45 P.M. Thus, even though Dr. Nearenberg did state at one point that it "may have been too late" to save her, he did unequivocally testify that had the defendants not departed from accepted medical practice Mrs. Randolph would be alive today, and the totality of his testimony evidenced that her life was still being sustained at 12:45 P.M. and that she could be saved at that time.

The defendant's expert, Dr. Sherman, focused on the negligent acts of the obstetrician-gynecologist, Dr. Cehelsky, in making the wrong incision and producing the lacerations which caused Mrs. Randolph to bleed so profusely. Nowhere in Dr. Sherman's testimony does he indicate specifically whether or not the patient was still curable at 12:45 and whether any measures could be taken to save her after that time.

There being sufficient evidence before the jury that Mrs. Randolph could have been saved, the inquiry properly turns to whether defendant Dr. Foster was negligent in his treatment of Mrs. Randolph once he undertook that duty and whether his negligence was a proximate cause of her death.

The care that Dr. Foster employed once he was authorized to issue the transfusion was woefully inadequate. Mrs. Randolph had by all accounts lost 2,000 cc of blood by 12:00 noon and close to 3 to 4,000 cc by the time the transfusion began at 12:45 P.M. Yet, Dr. Foster did not order an electrocardiographic monitor, so vital to assess the heart beat at these critical stages, until 12:30 P.M. The fluids with which Dr. Foster had transfused her until that point were apparently not sufficient to compensate for her blood loss. Nevertheless, Dr. Foster who had by this time begun to make inquiries to obtain legal authorization for a transfusion, had only two units of blood on hand and did not order more. By Dr. Foster's

own testimony, Mrs. Randolph needed eight units at 12:30 P.M., and at 12:45 P.M., when he began the transfusion, he stated that she required 10 units of blood.

The expert witness, Dr. Nearenberg, elaborated on the standard medical techniques that should have been employed. Another access should have been opened to prepare for additional intravenous fluids. The blood bank should have been alerted for an early release of extra blood.

Hampered by his own negligent failures to act in preparation, once Dr. Foster began he did not transfuse the blood quickly enough. Dr. Foster administered only 500 cc of whole blood, in a manner in which it took 45 minutes to enter the body, and 500 cc of packed cells plasma at a rate so slow that it never fully entered her body by the time she was pronounced dead at 2:00 P.M.

According to the expert testimony, a wider and good sized catheter could have been used, through which blood could be administered at a rate of one unit every 10 or 15 minutes. Moreover, a pressure bag could be employed whereby the blood could be transfused at a much swifter rate commensurate with the emergency nature of the procedure. Considering the large amounts of blood that Mrs. Randolph had already lost, Dr. Foster was negligent in failing to deliver the transfusion as quickly as he could have and in large enough doses to sustain Mrs. Randolph's life.

The jury properly found that Dr. Foster's negligence was a proximate cause of Mrs. Randolph's death. To establish proximate cause, the plaintiff must show that the defendant's negligence was a substantial cause of the events which produced the injury. (*Derdiarian v Felix Contr. Corp.,* 51 NY2d 308, 315; *Nallan v Helmsley-Spear, Inc.,* 50 NY2d 507, 520.) Having presented sufficient evidence from which the jury could infer that Mrs. Randolph was still capable of being saved at 12:45 P.M. and that the negligence of Dr. Foster was a substantial factor in causing her death, the jury could make the factual determination that Dr. Foster's negligence was a proximate cause. (*Kallenberg v Beth Israel Hosp.,* 45 AD2d 177, *affd* 37 NY2d 719.)

We are mindful of the consequences of the doctor's inaction, in respect of the patient's religious beliefs, prior to 12:45 P.M. The hemorrhaging was caused by the acts of Dr. Cehelsky in lacerating the wall of Mrs. Randolph's urinary bladder while making the incisions in performing the hysterectomy. The

condition was considerably aggravated by the failure to immediately begin a blood transfusion. However, in requiring that defendant's negligence be a substantial factor in bringing about the injury, the substantial factor need not be the only factor which produces the injury. *(Dunham v Village of Canisteo,* 303 NY 498; *Mortensen v Memorial Hosp.,* 105 AD2d 151.)

While there was no duty on Dr. Foster to administer a transfusion before 12:45 P.M., as the trial court properly charged, once the defendant voluntarily undertook steps to treat Mrs. Randolph and began his performance of the transfusion, there is no doubt that Dr. Foster had a duty to perform with due care. *(Parvi v City of Kingston,* 41 NY2d 553, 559; *Glanzer v Shepard,* 233 NY 236, 239; *Zelenko v Gimbel Bros.,* 158 Misc 904, *affd* 247 App Div 867.)

Mrs. Randolph did not experience a drastic change in her condition until 1:15, when she suffered the fatal cardiac arrest, a full half hour after Dr. Foster commenced his administrations. There was sufficient evidence for the jury to make the factual determination that Mrs. Randolph's condition was not irreversible at 12:45 P.M. The issue of proximate cause is a factual one, i.e., whether there was a substantial possibility that Mrs. Randolph could have lived but for the malpractice of Dr. Foster. *(Kallenberg v Beth Israel Hosp., supra; see Kimball v Scors,* 59 AD2d 984.) The jury having made that finding rationally, based on the facts adduced at trial, its verdict should not be set aside.

That we would affirm the jury's verdict does not mean that we are insensitive to the moral dilemmas faced by doctors in the exigencies of an emergency situation such as existed here. Regardless of these ethical circumstances, however, once a doctor takes steps to assist a patient he assumes a duty to exercise his professional standard of care. If he violates that duty and his negligence helps cause the patient's injury, then he may properly be found liable.

MURPHY, P. J., and KUPFERMAN, J., concur with Ross, J.; MILONAS and ELLERIN, JJ., dissent in an opinion by ELLERIN, J.

Judgment, Supreme Court, New York County, entered on November 9, 1984, reversed, on the law and the facts, the judgment vacated, and the complaint is dismissed, without costs and without disbursements.