Simons, J.
(dissenting). Respondents have established that Mary O’Connor did not wish any “artificial or mechanical support systems” used to sustain her life; if she were unable to function on her own, she wanted “nature to take its course”. That being so, and inasmuch as no countervailing State interest has been asserted, she is entitled to have the court respect and implement her choice. The majority refuses to do so because it holds her statements were too indefinite. Its holding substantially rewrites the law of self-determination, at least for cases such as this, and has for all practical purposes foreclosed any realistic possibility that a patient, once rendered incompetent, will have his or her wishes to forego life-sustaining treatment enforced. Moreover, these new requirements will undoubtedly increase litigation in this area because medical and hospital personnel, fearful of civil and criminal liability, will hesitate to honor patients’ wishes without judicial approval. Accordingly, I dissent.
I
Courts have resolved the question of when medical treatment of the gravely ill may be terminated by using two legal theories. The first is based on the common-law right of self- *540 determination, which gives an individual essentially unrestricted authority to limit others’ contact with his or her body (see, Rivers v Katz, 67 NY2d 485, 492-493; Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129). This fundamental right, similar to other privacy rights recognized at common law and by the Constitution, guarantees individuals the freedom to behave as they deem fit so long as their wishes do not conflict with the precepts of society. It encompasses a patient’s freedom to refuse medical treatment even when such refusal is life threatening (see, e.g., Randolph v City of New York, 117 AD2d 44, 49, mod 69 NY2d 844; Matter of Erickson v Dilgard, 44 Misc 2d 27 [Meyer, J.]), and it particularly includes the right of a dying patient to refuse medical care or treatment that cannot restore health (Matter of Storar; and Matter of Eichner v Dillon, 52 NY2d 363, 376-379). Before a patient’s right of self-determination can be enforced, however, his or her wishes must be ascertained. If the patient is incompetent and cannot presently express those wishes, they will be enforced if established by clear and convincing evidence. The right to reject treatment is not absolute but, absent some overriding State interest, the courts are bound to recognize and enforce it. The test for granting relief is entirely subjective: what does the patient desire done. The court’s role is limited to ensuring that effectuating the patient’s wishes does not violate the State’s interest; it may not intrude into this area of personal autonomy and impose its paternalistic view of the patient’s best interests (see, Matter of Storar, supra).
The second theory is the substituted judgment approach. Although courts apply this theory differently,' generally the obligation of the court when implementing substituted judgment is to ensure that a surrogate of the patient, usually a family member or a guardian, effectuates as nearly as possible the decision the incompetent would make if he or she were able to state it (see, Matter of Jobes, 108 NJ 394, 529 A2d 434). The subjective views of the patient remain important, but the absence of a clearly expressed intent is not determinative; objective factors are also considered in deciding what' is best for the patient in the circumstances presented. Thus, the surrogate’s decision should take into account the patient’s personal values and religious beliefs, prior statements on the subject, attitudes about the impact his or her condition will have on others, and any other factors bearing on the issue. Inasmuch as the patient’s wishes cannot be known with certainty, objective factors indicating that the burdens of *541 continued life outweigh the benefits of that life for the patient are significant.
Both these theories were presented to us in Matter of Storar and its companion case, Matter of Eichner (52 NY2d 363, supra). Matter of Eichner involved Brother Fox, a member of a religious order, who, having expressed his views on the situation of Karen Quinlan (see, Matter of Quinlan, 70 NJ 10, 355 A2d 647, cert denied sub nom. Garger v New Jersey, 429 US 922), subsequently suffered from precisely the same condition. We had little difficulty in discovering Brother Fox’s subjective wishes under those unusual circumstances, and we recognized his right of self-determination. Matter of Storar presented the case of a terminally ill cancer patient who had never been able to express his wishes because he had been profoundly mentally retarded from birth. His mother requested the termination of painful, life-sustaining treatment,, but this court refused to accept her "substituted judgment”. I participated in Storar in the Appellate Division and voted otherwise (see, Matter of Storar, 78 AD2d 1013, revd 52 NY2d 363, supra).
I find this court’s decision in Storar unfortunate. Like Judge Hancock, I believe there should be some recognized legal process to address the use of life-sustaining measures for patients who, because of age or mental condition, are unable to express their wishes or who, through oversight, have failed to do so. A broadening of the Eichner rule is necessary because under it relief would be denied even to a person in a vegetative state, like Karen Quinlan, who had never expressed her wishes on the subject. Moreover, the absence of such a rule actually may cause physical and emotional pain to be inflicted on the patient and the patient’s family for the sake of "treatment”. One need look no further than the case of Charles Storar, the 52-year-old patient with a mental age of 18 months, who was terminally ill with bladder cancer. He was required to undergo regular blood transfusions to maintain his life. As a result, he was subjected to continuous pain and the frightful experience, for one of his mental age, of observing blood and blood clots in his urine. His 77-year-old mother experienced the emotional trauma of her son’s last days, spent in pain from compelled medical treatment.
The absence of relief in New York under such circumstances undoubtedly inflicts needless suffering on many of our citizens, and simple decency requires that a remedy be found. I would prefer that we provide relief by broadening our limited rule and joining the majority of American jurisdictions *542 that recognize some form of substituted judgment[1] (see, e.g., Matter of Jobes, 108 NJ 394, 529 A2d 434, supra; Matter of Conroy, 98 NJ 321, 486 A2d 1209; Brophy v New England Sinai Hosp., 398 Mass 417, 497 NE2d 626; Kennedy Mem. Hosp. v Bludworth, 452 So 2d 921 [Fla]; Rasmussen v Fleming, 154 Ariz 207, 741 P2d 674; Conservatorship of Drabick, 200 Cal App 3d 185, 245 Cal Rptr 840, review denied — Cal — [July 28, 1988]; and see, President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavior Research, Deciding to Forego Life-Sustaining Treatment, at 126-136; Report of New York State Task Force on Life and the Law, Life Sustaining Treatment [July 1987], at 14-16, 26-27, 73 [recognizing the need, because of this court’s decision in Storar, for legislation to permit some form of substituted judgment]).
Nevertheless, the Storar and Eichner cases established the New York law on the subject: the only available avenue for relief is to establish the patient’s subjective wishes and the only relevant proof is evidence of the patient’s statements on the subject made before he or she became incompetent.[2] The patient’s mental and physical condition is not relevant except as it may implicate the State’s interests.
Applying that rule, Mary O’Connor clearly expressed her wishes in the only realistic way she could and, inasmuch as none of the litigants claims the State has any interest in prolonging her life, her wishes should be recognized and the order oi; the Appellate Division should be affirmed. The order will not be affirmed, however, because the majority, by its decision today, narrowly restricts the only available avenue of relief. Mary O’Connor’s wishes will not be recognized because her daughters cannot prove she anticipated her present condition and specifically stated that under such circumstances she chose to die rather than be nourished by artificial means. The court has confined the Eichner holding to the singular facts of that case and inasmuch as few persons will be able to satisfy *543 the new test, the right of self-determination is reduced to a hollow promise.
II
Preliminarily, it is important to clearly understand the facts of Mary O’Connor’s condition.
Mrs. O’Connor is a 77-year-old widow who has suffered a series of progressively debilitating strokes that have left her bedridden, substantially paralyzed, and unable to care for herself. Dr. Sivak, an associate director of petitioner hospital who attended Mrs. O’Connor daily, described her as "severely demented” and Dr. Wasserman, the respondents’ expert, described her as "profoundly incapacitated”. She is neither comatose nor in a vegetative state, but she responds only sporadically to simple questions or commands, and then frequently inappropriately. The doctors agree that the neurological damage from the strokes is irreparable, and no hope exists for significant improvement in her mental or physical condition.
Mrs. O’Connor has two daughters, Helen Hall and Joan Fleming, who have attended her since her health began to deteriorate. They graphically described her condition. Mrs. O’Connor lived with Mrs. Hall after a stroke in 1985 and until she had another in December 1987. At that time she was transferred to a nursing home and, after her condition deteriorated, she was transferred to Westchester County Medical Center. Both daughters testified that since their mother was hospitalized at the Medical Center they have visited her daily, sometimes twice a day and, despite their efforts to detect some sign of consciousness, their mother has never spoken or responded to them in any way, even by facial expression or hand movement. Mrs. Fleming described her visit to the hospital the Friday before the trial of this proceeding started. She stood by her mother’s bedside and tried to explain to her the procedure for feeding by nasogastric tube. She got no reaction. Mrs. O’Connor "did not even open her eyes”.
As a result of her stroke in December 1987, Mrs. O’Connor lost her ability to swallow. She apparently has a gag reflex but she cannot control it neurologically. Accordingly, Mrs. O’Con-nor cannot be fed orally and artificial intervention is required to deliver nourishment to her body. She is presently fed intravenously, but that will soon be impossible. Thus, the hospital seeks to intubate her and pass food through her nose *544 directly to her stomach. The doctors estimate that given her underlying condition, Mrs. O’Connor’s life can be sustained in this fashion for a period of two months to two years. The nourishment will strengthen her generally, but will not improve her condition. She will continue to exist, as the trial court found, but will remain in an "irreversibly incapacitated condition”.
This evidence was accepted by the trial court and the Appellate Division and, under rules of law too well known to require citation, it binds this court. Nevertheless, the majority characterizes Mrs. O’Connor’s condition in quite different terms, stating: "She is awake and conscious; she can feel pain, responds to simple commands, can carry on limited conversations, and is not experiencing any pain. She is simply an elderly person who as a result of several strokes suffers certain disabilities, including an inability to feed herself or eat in a normal manner * * * Because of her age and general physical condition, her life expectancy is not great. But that is true of many nursing home patients.” (Majority opn, at 533.)
Dr. Sivak described Mrs. O’Connor’s ability to engage in "limited conversations” somewhat differently. In response to a question whether she could speak, he answered, "She will phonate, make a sound and sometimes answer yes. She will answer when asked what her name is, she’ll say 'Mary’ and phonate. That’s about it really”. He later testified the only other words she used were " 'okay’, 'alright’, something like that”. Neither of the doctors could testify with assurance, moreover, that she even understood the questions she "answered”.
Dr. Sivak testified that Mrs. O’Connor sometimes responded to "simple commands” or questions by squeezing his hand, but when he asked her to take a deep breath so he could listen to her lungs, or asked whether she was in pain, where she was or similar questions, she did not respond. He assumed this was because "it is difficult for her to understand”. Although the majority states she attempted to sit up and to roll over, none of the witnesses who testified saw Mrs. O’Connor do so. The statement was hearsay reported by a doctor who saw Mrs. O’Connor in the hospital one day.
As far as Mrs. O’Connor’s ability to feed herself, she is not simply "an elderly person” unable to do so. Unlike a patient weakened by infirmity, or an infant who is capable of eating if only someone will put the food in their mouth, Mrs. O’Con- *545 nor’s ability to swallow, necessary to continued existence, is gone and cannot be restored. Unless its absence is replaced by artificial means, she will die. This breakdown is a substantial loss of a bodily function, analogous to a patient’s loss of kidney function requiring dialysis to sustain life or the inability to breathe without the aid of a respirator. Indeed, Mrs. O’Connor cannot even ask to be fed because, as Dr. Sivak said, "she could not comprehend that question”. The majority contends the key factor setting Mrs. O’Connor apart from others "is her inability to eat or obtain nourishment without medical assistance.” (Majority opn, at 533.) Of course, the only thing that set Karen Quinlan and Brother Fox apart from other patients was their inability to breathe without respirators.
Mrs. O’Connor’s condition has improved from the stuporous condition she was in when she entered the hospital because the pneumonia and urinary infection she then had have been treated. No significant change in her underlying condition has been observed, however, and the debilities from which she suffers certainly cannot be described as "improved”. While she may not be terminally ill in the sense that death is imminent, she is dying because she has suffered severe injuries to her brain and body which, if nature takes its course, will result in death. Full medical intervention will not cure or improve her, it will only maintain her in a rudimentary state of existence.
I could go on but this is sufficient to demonstrate why the trial court, the Appellate Division and I view Mrs. O’Connor’s physical condition quite differently than the majority.
III
Both courts below, properly applying the clear and convincing standard of evidence, found that Mrs. O’Connor did not wish any artificial means used to prolong her life under these circumstances. This affirmed finding is abundantly supported by the evidence in the record, for Mrs. O’Connor clearly stated her wishes on many occasions, and it should be dispositive.
Specifically, Mr. Lampasso, her coemployee and the assistant director of pathology at the hospital where she worked, testified that he and Mrs. O’Connor had several discussions about prolonging life by artificial means, occasioned by deaths or illnesses in their families. She consistently expressed her view that artificial means should not be used to sustain life. He related in detail one discussion with her in which she *546 stated that if ill, she would never want to be a burden or "lose her dignity”, that "nature should take its course” without the use of "artificial means”; she thought it was "monstrous to keep someone alive” by artificial means, "by using machinery, things like that if they were not going to get better”. Although this conversation occurred several years earlier, to Mr. Lampasso’s knowledge, Mrs. O’Connor had not changed her views.
Mrs. O’Connor also discussed the use of artificial means to sustain her life with her daughter, Mrs. Hall, after Mrs. O’Connor’s husband died and again after Mrs. O’Connor was hospitalized for congestive heart failure in 1984, telling her daughter she hoped she would never have to go to the hospital again and that "she would never want any sort of intervention, any sort of life support system” (emphasis added). Her other daughter, Mrs. Fleming, testified to similar statements by her mother. When the particularity of her mother’s statements was questioned at trial, as the majority questions them now, she stated she had "no doubt” her mother would not wish artificial means used to prolong her life in the present situation.
Notwithstanding these statements of her intentions, which it accepts as accurate, the majority characterizes them as inadequate, for a variety of reasons, and refuses to recognize them. I disagree with the majority’s characterizations of Mrs. O’Connor’s conversations, as I do with its description of her physical condition, but I find even more troublesome the court’s exercise of fact-finding powers on the subject. This court is a court of law (NY Const, art VI, § 3). It cannot find facts, but must take them as found by the lower courts. Simply because the clear and convincing standard of proof is applicable, rather than the more common preponderance of the evidence standard, does not alter this fundamental principle. The trier of facts, whether Judge or a jury, makes findings and draws inferences from the evidence and if those findings are affirmed by the Appellate Division, our review is limited solely to determining whether there is any valid line of reasoning and permissible inferences which could lead a rational person, using the proper standard, to the conclusion reached by the trier of fact on the basis of the evidence at trial (People v Bleakley, 69 NY2d 490; Humphrey v State of New York, 60 NY2d 742, 743-744; Le Roux v State of New York, 307 NY 397, 405; see generally, Cohen and Karger, *547 Powers of the New York Court of Appeals § 111, at 476-478 [rev ed]).
The majority does not, nor could it, claim that the courts below used the wrong legal standard. Neither does it hold that the facts and inferences drawn by the lower courts lack support in the record. Nevertheless, the majority makes its own findings and draws its own inferences to support its contrary decision. For example, the majority states "Although Mrs. O’Connor’s statements about her desire to decline lifesaving treatments were repeated over a number of years, there is nothing, other than speculation, to persuade the fact finder that her expressions were more than her immediate reactions to the unsettling experience of seeing or hearing of another’s unnecessarily prolonged death.” (Majority opn, at 532.) The trial court and the Appellate Division drew exactly the opposite conclusion from the evidence. The trial court, after seeing and hearing the witnesses, inferred that the sophistication of Mrs. O’Connor’s desire to withhold artificial life support "was evidenced by her background in hospital-services as well as her years of caring for ill relatives. The consistency in her stated wishes over the years also established the careful consideration she gave her choice” (trial court, slip opn, at 6). Nor is the majority correct that Mrs. O’Connor’s reactions were always in response to seeing or hearing of another’s death or prolonged illness (majority opn, at 532). The clearest statement of Mrs. O’Connor’s wishes was made after her own hospitalization for congestive heart failure. She told her daughter that she "was very glad to be out of the hospital and hope[d] she would never have to be back in one again and would never want any sort of intervention, any sort of life support systems to maintain or prolong her life.”
One more illustration will serve to prove the point. The majority states that the applicable rule is that "the trier of fact must be convinced, as far as is humanly possible, that the strength of the individual’s beliefs and the durability of the individual’s commitment to those beliefs * * * makes a recent change of heart unlikely.” (Majority opn, at 531.) The majority relies on the absence of such proof in reaching its result. Manifestly, the courts with fact-finding powers concluded that Mrs. O’Connor did not have a change of heart. Had they found otherwise, they could not have granted her daughters relief.
IV
The majority refuses to recognize Mrs. O’Connor’s expressed *548 wishes because they were not solemn pronouncements made after reflection and because they were too indefinite.
Respondents have established the reliability of the statements under any standard. The hospital has acknowledged the truth and the accuracy of the evidence of their mother’s wishes, and the majority accepts its truth and accuracy also and there can be no question Mrs. O’Connor’s statements reflected her personal convictions. These were not "casual remarks”, but rather expressions evidencing the long-held beliefs of a mature woman who had been exposed to sickness and death in her employment and her personal life. Mrs. O’Connor had spent 20 years working in the emergency room and pathology laboratory of Jacobi Hospital, confronting the problems of life and death daily. She suffered through long illnesses of her husband, stepmother, father and two brothers who had died before her. She herself has been hospitalized for congestive heart failure and she understood the consequences of serious illnesses.
Because of these experiences, Mrs. O’Connor expressed her wishes in conversations with her daughters, both trained nurses, and a coemployee from the hospital who shared her hospital experience. There can be no doubt she was aware of the gravity of the problem she was addressing and the significance of her statements, or that those hearing her understood her intentions. She clearly stated the values important to her, a life that does not burden others and its termination with dignity, and what she believed her best interests required in the case of severe, debilitating illness. She found "monstrous” the imposition of artificial means to maintain her under circumstances when natural conditions would end her life, and she objected to the use of "any” and "all” life-support systems on her behalf.
Notwithstanding this, the majority finds the statements entitled to little weight because Mrs. O’Connor’s exposure was mostly to terminally ill cancer patients, or because her desire to remain independent and avoid burdening her children constituted little more than statements of self-pity by an elderly woman. There is no evidence to support those inferences and no justification for trivializing Mrs. O’Connor’s statements. She is entitled to have them accepted without reservation. Particularly offensive is the majority’s implication that the daughters’ case is somehow weakened or prejudiced because they did not object to spoon-feeding their mother. *549 Such a decision, whether resulting from indecision, hope for the patient’s improvement or because the feeding did not involve artificial means, is irrelevant.
The majority asserts that this kind of decision would be more reliable if contained in a power of attorney or a living will. I fail to see how that would help this case. The problem is not in establishing Mrs. O’Connor’s wishes. They were clearly stated and convincingly proven. The majority faults the proof because her statements were not sufficiently specific. Use of a power of attorney or written instructions will not solve the requirement of specificity. Indeed, the substantial burden of specificity the majority now imposes will be met in few cases, whether the instructions are memorialized in writings such as powers of attorney and living wills, or delivered with the utmost formality to family or trusted friends and advisors.
V
The requirement of specificity is to be found in the majority’s statement that the patient’s family must prove by clear and convincing evidence: that the patient held a firm and settled commitment to the termination of life-support systems under the circumstances presented (majority opn, at 531), and that she would consider the alternative of death without the life-support system in question, in this case lack of nourishment, preferable to being sustained by artificial means (majority opn, at 531, 533, 534). As the majority concedes, it is a "demanding standard”. Inasmuch as Mrs. O’Connor’s daughters could not honestly testify that their mother, when competent, had anticipated her present condition and made the choice to forego nourishment by mechanical means, the majority holds the case for self-determination is not made out. I find it ironic that the court that held that a mentally ill patient has a constitutional right to decline medication which would improve his condition, absent overriding State interests (see, Rivers v Katz, 67 NY2d 485, supra) now holds an incompetent patient cannot forego the use of artificial life-sustaining machines offering no hope of improvement or cure. More to the point, I find the majority’s rule unworkable and unwise.
The rule is unworkable because it requires humans to exercise foresight they do not possess. It requires that before life-sustaining treatment may be withdrawn, there must be proof that the patient anticipated his or her present condition, *550 the means available to sustain life under the circumstances, and then decided that the alternative of death without mechanical assistance, by starvation in this case, is preferable to continued life (majority opn, at 531,532-533). The majority states that Mrs. O’Connor’s instructions are rejected because the "infirmities she was concerned with and the procedures she eschewed are qualitatively different than those now presented”. The implication is that courts may exercise some flexibility in applying these rigorous standards if the condition and treatment referred to in the patient’s instructions and those that presently exist are qualitatively similar. If that is so, the majority’s statement fails to include any test for determining when conditions and procedures are "qualitatively” the same or different. Is physical and mental incapacity caused by accident qualitatively similar to the same condition caused by illness? Is incapacity caused by cancer qualitatively similar to the same condition caused by cerebral accident? Judging from the distinction the majority has drawn between Mary O’Connor’s prior experience with cancer patients and her present condition, one would guess its answer would be "no”. As to support systems, is feeding by nasogastric tube qualitatively different from the surgical implantation of a feeding tube in the patient’s stomach or intestine? The two options involve different procedures and present different risks. Inasmuch as it is now no longer sufficient to provide that "all” life-support systems be withdrawn, the patient must anticipate these distinctions and resolve them. If he or she fails to do so, the instructions will not be recognized.
I also doubt that medical personnel are capable of implementing this standard of "qualitative” similarity. Whatever meaning or content the term may have for lawyers, it has none for doctors or laymen. Indeed, physicians do not even agree on what is "extraordinary” or "ordinary” care, "optional” or "obligatory” care, or "advanced” and "basic life support systems”. Nor is there agreement on the definitions for words like "life support system”, "artificial means” or "life-sustaining system” (see, President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment, at 82-89 [1982]; New York Task Force on Life and the Law, Life-Sustaining Treatment, at 3 [1987]; Ruark, Initiating and Withdrawing Life Support, 318 N Eng J Med 25 [1988]; US Congress, Office of Technology Assessment, Life-Sustaining Technologies and the Elderly, at 415 [1987]). The *551 practical problem is illustrated in the Report of the President’s Commission which noted the difficulty in achieving agreement among doctors even on whether respirators were "ordinary” or "extraordinary treatment” (supra, at 83). Given the uncertainty of these common terms, it is unrealistic that doctors or patients will be able to distinguish qualitatively similar or different treatment and effectively implement the patient’s wishes.
Even if a patient possessed the remarkable foresight to anticipate some future illness or condition, however, it is unrealistic to expect or require a lay person to be familiar with the support systems available for treatment — to say nothing of requiring a determination of which is preferable or the consequences that may result from using or foregoing them. Indeed, the conditions and consequences may change from day to day. Dr. Sivak testified that even he has not decided which method of nourishment he will use for Mrs. O’Connor if the hospital is successful in this proceeding.
In short, Mary O’Connor expressed her wishes in the only terms familiar to her, and she expressed them as clearly as a lay person should be asked to express them. To require more is unrealistic, and for all practical purposes, it precludes the right of patients to forego life-sustaining treatment.
The rule adopted is not only unworkable, it is unwise. Given the disparity of knowledge between lay persons and doctors, medical personnel will undoubtedly be reluctant to honor a patient’s instructions if they are unclear or less than complete. Inevitably, the courts will be required to intervene, not because the State has any interest in prolonging the life of the particular patient, but because the family and the doctors are uncertain that the patient’s wishes meet the majority’s strict standard and are justifiably concerned about the consequences of an erroneous decision. The majority holds that the instructions must be specific, solemn pronouncements, but they need not be precise. Surely, no doctor is prepared to implement that ambiguous legal direction without judicial assistance. The patient’s statements will have to be construed like statutes or contract terms — and the courts necessarily must be the ones to construe them, to make the findings and draw the inferences interpreting the patient’s statements, using the imprecise considerations set forth in the majority opinion — to determine if the strict, "demanding” standard of the majority has been met. Decisions under such circumstances will necessarily *552 reflect the value choices of the Judge, rather than those of the patient, and are nothing short of arbitrary intrusions into the personal life of the patient.
In simpler times, decisions involving life and death were made by the family and its advisors based upon the patient’s wishes or what the family thought best as justified by its knowledge of the patient’s values and its sense of what the patient’s best interests required. In today’s world, the sick are removed to hospitals where a broad array of mechanical equipment awaits, capable of prolonging life even though no cure or repair is possible. Necessarily, others must be involved in the decision whether to use it. Until today, under New York law, decisions concerning medical treatment remained the right of the patient. Today’s opinion narrowly circumscribes our rule to a degree that makes it all but useless. Few, if any, patients can meet the demanding standard the majority has adopted and the requirements of precision will necessarily be satisfied by pragmatic judicial decisions of what is "best” under the circumstances. If the court wishes to recognize the need for a substituted judgment rule in cases where the patient’s wishes are not specific enough or cannot be clearly determined, then it should clearly announce the rule, define it, and give the parties an opportunity for a surrogate decision that can be reviewed by the court. Instead, the majority, disguising its action as an application of the rule on self-determination, has made its own substituted judgment by improperly finding facts and drawing inferences contrary to the facts found by the courts below. Judges, the persons least qualified by training, experience or affinity to reject the patient’s instructions, have overridden Mrs. O’Connor’s wishes, negated her long held values on life and death, and imposed on her and her family their ideas of what her best interests require.
Accordingly, I dissent and would affirm the order of the Appellate Division.
Judges Kaye, Titone and Bellacosa concur with Chief Judge Wachtler; Judge Hancock, Jr., concurs in result in a separate opinion; Judge Simons dissents and votes to affirm in another opinion in which Judge Alexander concurs.
Order reversed, etc.

. Judge Alexander takes no position on the desirability of the theory of substituted judgment or similar rules.

. The Storar decision has been widely criticized for its overly restrictive consequences (see, e.g., Matter of Hier, 18 Mass App 200, 464 NE2d 959, review denied 392 Mass 1102, 465 NE2d 261; Conservatorship of Drabick, 200 Cal App 3d 185, 245 Cal Rptr 840; Note, A Patient’s Last Rights— Termination of Medical Care — an Analysis of New York’s In re Storar, 46 Albany L Rev 1380; Comment, In Re Storar: The Right to Die and Incompetent Patients, 43 U Pitt L Rev 1087).