OPINION OF THE COURT
Wachtler, J.
In these two cases the guardians of incompetent patients objected to the continued use of medical treatments or measures to prolong the lives of the patients who were diagnosed as fatally ill with no reasonable chance of recovery. In Matter of Eichner, Brother Fox, an 83-year-old member of the Society of Mary, was being maintained by a respirator in a permanent vegetative state. The local director of the society applied to have the respirator removed on the ground that it was against the patient’s wishes as expressed prior to his becoming incompetent. In Matter of Storar, a State official applied for permission to administer blood transfusions to a profoundly retarded 52-year-old man with terminal cancer of the bladder. The patient’s mother, who was also his legal guardian, refused consent on the ground that the transfusions would only prolong his discomfort and would be against his wishes if he were competent. In each case the courts below have found that the measures should have been discontinued.
The orders of the lower courts were stayed and the treatments continued pending appeals to the Appellate Division and this court. Nevertheless both of the patients have died, thus rendering these particular controversies moot.[1] However, the underlying issues are of public importance, are recurring in other courts throughout the *370 State and, as these cases illustrate, are likely to escape full appellate review even when the appeals have been expedited. Under those circumstances we may, and often have, addressed the issues despite the mootness (see, e.g., Matter of Oliver v Postel, 30 NY2d 171, 177-178; Matter of Westchester Rockland Newspapers v Leggett, 48 NY2d 430, 436-437), particularly when, as here, the controlling principles have not been previously identified and discussed by this court (cf. Matter of Hearst Corp. v Clyne, 50 NY2d 707).
It should be emphasized though, that any guidance we may provide for future cases is necessarily limited. Unlike the Legislature, the courts are neither equipped nor . empowered to prescribe substantive or procedural rules for all, most, or even the more common contingencies. Our role, especially in matters as sensitive as these, is limited to resolving the issues raised by facts presented in particular cases.* [2]
 On the records we have concluded that the order should be reversed in the Storar case. In the Eichner case the order should be modified and resolved on a narrower ground than relied on by the Appellate Division.
THE EICHNER CASE
For over 66 years Brother Joseph Fox was a member of the Society of Mary, a Catholic religious order which, among other things, operates Chaminade High School in *371 Mineóla. In 1970 Brother Fox retired to Chaminade where he resided with the religious members of the school’s staff and continued to perform limited duties. In late summer of 1979 he sustained a hernia while moving some flower tubs on a roof garden at the school. He was then 83 years old and, except for the hernia, was found to be in excellent health. His doctor recommended an operation to correct the condition and Brother Fox agreed.
While the operation was being performed on October 1, 1979 he suffered cardiac arrest, with resulting loss of oxygen to the brain and substantial brain damage. He lost the ability to breathe spontaneously and was placed on a respirator which maintained him in a vegetative state. The attending physicians informed Father Philip Eichner, who was the president of Chaminade and the director of the society at the school, that there was no reasonable chance of recovery and that Brother Fox would die in that state.
After retaining two neurosurgeons who confirmed the diagnosis, Father Eichner requested the hospital to remove the respirator. The hospital, however, refused to do so without court authorization. Father Eichner then applied, pursuant to article 78 of the Mental Hygiene Law, to be appointed committee of the person and property of Brother Fox, with authority to direct removal of the respirator. The application was supported by the patient’s 10 nieces and nephews, his only surviving relatives. The court appointed a guardian ad litem and directed that notice be served on various parties, including the District Attorney.
At the hearing the District Attorney opposed the application and called medical experts to show that there might be some improvement in the patient’s condition. All the experts agreed, however, that there was no reasonable likelihood that Brother Fox would ever emerge from the vegetative coma or recover his cognitive powers.
There was also evidence, submitted by the petitioner, that before the operation rendered him incompetent the patient had made it known that under these circumstances he would want a respirator removed. Brother Fox had first expressed this view in 1976 when the Chaminade community discussed the moral implications of the celebrated Karen Ann Quinlan *372 case, in which the parents of a 19-year-old New Jersey girl who was in a vegetative coma requested the hospital to remove the respirator (see Matter of Quinlan, 137 NJ Super 227, revd 70 NJ 10, cert den sub nom. Garger v New Jersey, 429 US 922). These were formal discussions prompted by Chaminade’s mission to teach and promulgate Catholic moral principles. At that-time it was noted that the Pope had stated that Catholic principles permitted the termination of extraordinary life support systems when there is no reasonable hope for the patient’s recovery and that church officials in New Jersey had concluded that use of the respirator in the Quinlan case constituted an extraordinary measure under the circumstances. Brother Fox expressed agreement with those views and stated that he would not want any of this “extraordinary business” done for him under those circumstances. Several years later, and only a couple of months before his final hospitalization, Brother Fox again stated that he would not want his life prolonged by such measures if his condition were hopeless.
In a thoughtful and comprehensive opinion, Mr. Justice Robert C. Meade at the Supreme Court held that under the circumstances Brother Fox would have a common-law right to decline treatment and that his wishes, expressed prior to becoming incompetent, should be honored. The court noted that the evidence of his stated opposition to use of a respirator to maintain him in a vegetative state was “unchallenged at every turn and unimpeachable in its sincerity.”
The Appellate Division modified in an exhaustive and wide-ranging opinion by Presiding Justice Milton A. Mollen. The court held that the patient’s right to decline treatment was not only guaranteed by the common law but by the Constitution as well. It also found that this right should not be lost when a patient becomes incompetent and, if a patient has not made his wishes known while competent as Brother Fox had done, an appropriate person should be appointed to express the right on his behalf by use of “substituted judgment”. The court went on to establish an elaborate set of procedures to be followed by doctors, hospitals, family members, parties and the courts before future applications of this nature may be entertained or granted.
*373 THE STORAR CASE
John Storar was profoundly retarded with a mental age of about 18 months. At the time of this proceeding he was 52 years old and a resident of the Newark Development Center, a State facility, which had been his home since the age of 5. His closest relative was his mother, a 77-year-old widow who resided near the facility. He was her only child and she visited him almost daily.
In 1979 physicians at the center noticed blood in his urine and asked his mother for permission to conduct diagnostic tests. She initially refused but after discussions with the center’s staff gave her consent. The tests, completed in July, 1979, revealed that he had cancer of the bladder. It was recommended that he receive radiation therapy at a hospital in Rochester. When the hospital refused to administer the treatment without the consent of a legal gqardian, Mrs. Storar applied to the court and was appointed guardian of her son’s person and property in August, 1979. With her consent he received radiation therapy for six weeks, after which the disease was found to be in remission.
However in March, 1980 blood was again observed in his urine. The lesions in his bladder were cauterized in an unsuccessful effort to stop the bleeding. At that point his physician diagnosed the cancer as terminal, concluding that after using all medical and surgical means then available, the patient would nevertheless die from the disease.
In May the physicians at the center asked his mother for permission to administer blood transfusions. She initially refused but the following day withdrew her objection. For several weeks John Storar received blood transfusions when needed. However, on June 19 his mother requested that the transfusions be discontinued.
The director of the center then brought this proceeding,[3] pursuant to section 33.03 of the-Mental Hygiene Law, seeking authorization to continue the transfusions, *374 claiming that without them “death would occur within weeks”. Mrs. Storar cross-petitioned for an order prohibiting the transfusions, and named the District Attorney as a party. The court appointed a guardian ad litem and signed an order temporarily permitting the transfusions to continue, pending the determination of the proceeding.
At the hearing in September the court heard testimony from various witnesses including Mrs. Storar, several employees at the center, and seven medical experts. All the experts concurred that John Storar had irreversible cancer of the bladder, which by then had spread to his lungs and perhaps other organs, with a very limited life span, generally estimated to be between 3 and 6 months. They also agreed that he had an infant’s mentality and was unable to comprehend his predicament or to make a reasoned choice of treatment. In addition, there was no dispute over the fact that he was continuously losing blood.
The medical records show that at the time of the hearing, he required two units of blood every 8 to 15 days. The staff physicians explained that the transfusions were necessary to replace the blood lost. Without them there would be insufficient oxygen in the patient’s blood stream. To compensate for this loss, his heart would have to work harder and he would breathe more rapidly, which created a strain and was very tiresome. He became lethargic and they feared he would eventually bleed to death. They observed that after the transfusions he had more energy. He was able to resume most of his usual activities — feeding himself, showering, taking walks and running — including some mischievous ones, such as stealing cigarette butts and attempting to eat them.[4]
*375 It was conceded that John Storar found the transfusions disagreeable. He was also distressed by the blood and blood clots in his urine which apparently increased immediately after a transfusion. He could not comprehend the purpose of the transfusions and on one or two occasions had displayed some initial resistance. To eliminate his apprehension he was given a sedative approximately one hour before a transfusion. He also received regular doses of narcotics to alleviate the pain associated with the disease.
On the other hand several experts testified that there was support in the medical community for the view that, at this stage, transfusions may only prolong suffering and that treatment could properly be limited to administering pain killers. Mrs. Storar testified that she wanted the transfusions discontinued because she only wanted her son to be comfortable. She admitted that no one had ever explained to her what might happen to him if the transfusions were stopped. She also stated that she was not “sure” whether he might die sooner if the blood was not replaced and was unable to determine whether he wanted to live. However, in view of the fact that he obviously disliked the transfusions and tried to avoid them, she believed that he would want them discontinued.
The court held that the center’s application for permission to continue the transfusions should be denied. It was noted that John Storar’s fatal illness had not affected his limited mental ability. He remained alert* **[5] and carried on many of his usual activities. However, the court emphasized that the transfusions' could not cure the disease, involved some pain and that the patient submitted to them reluctantly. The court held that a person has a right to determine what will be done with his own body and, when he is incompetent, this right may be exercised by another on his behalf. In this case, the court found that John Storar’s *376 mother was the person in the best position to determine what he would want and that she “wants his suffering to stop and believes that he would want this also.”
The Appellate Division affirmed in a brief memorandum.
I
In the Eichner case the Supreme Court properly granted the petition. At common law, as Cardozo noted, every person “of adult years and sound mind has a right to determine what should be done with his own body; and a surgeon who performs an operation without his patient’s consent commits an assault, for which he is liable in damages * * *. This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained” (Schloendorff v Society of N. Y. Hosp., 211 NY 125, 129-130; see, also, Pearl v Lesnick, 20 AD2d 761, affd 19 NY2d 590; Garzione v Vassar Bros. Hosp., 36 AD2d 390, affd 30 NY2d 857; 2 Harper and James, Law of Torts, 61 [1968 Supp]; Patient’s Right to Refuse Treatment Allegedly Necessary to Sustain Life, Ann., 93 ALR 3d 67). Even in emergencies, however, it is held that consent will not be implied if the patient has previously stated that he would not consent (Restatement, Torts 2d, § 62, Illustration 5; Powell, Consent to Operative Procedures, 21 Md L Rev 189, 199; Bryn, Compulsory Life Saving Treatment for the Competent Adult, 44 Fordham L Rev 1, 15, n 64). The basic right of a patient to control the course of his medical treatment has been recognized by the Legislature (see Public Health Law, §§ 2504, 2805-d; CPLR 4401-a).
 Father Eichner urges that this right is also guaranteed by the Constitution, as an aspect of the right to privacy. Although several courts have so held (see, e.g., Matter of Quinlan, 70 NJ 10, supra; Superintendent of Belchertown State School v Saikewicz, 373 Mass 728), this is a disputed question (see, e.g., Bryn, op. cit., pp 5-9), which the Supreme Court has repeatedly declined to consider (see Note, The “Living Will”: The Right to Death With Dignity?, 26 Case Western Reserve L Rev 485, 501, n 76; see, also, Garger v New Jersey, 429 US 922, supra). *377 Neither do we reach that question in this case because the relief granted to the petitioner, Eichner, is adequately supported by common-law principles.
The District Attorney urges that the patient’s right to decline medical treatment is outweighed by important State interests when the treatment is necessary to preserve the patient’s life. We recognize that under certain circumstances the common-law right may have to yield to superior State interests, as it would even if it were constitutionally based (Roe v Wade, 410 US 113, 154-155 ; Doe v Bolton, 410 US 179). The State has a legitimate interest in protecting the lives of its citizens. It may require that they submit to medical procedures in order to eliminate a health threat to the community (see, e.g., Jacobson v Massachusetts, 197 US 11). It may, by statute, prohibit them from engaging in specified activities, including medical procedures which are inherently hazardous to their lives (Roe v Wade, supra, pp 150, 154). In this State, however, there is no statute which prohibits a patient from declining necessary medical treatment or a doctor from honoring the patient’s decision. To the extent that existing statutory and decisional law manifests the State’s interest on this subject, they consistently support the right of the competent adult to make his own decision by imposing civil liability on those who perform medical treatment without consent, although the treatment may be beneficial or even necessary to preserve the patient’s life (see, e.g., Schloendorff v Society of N. Y. Hosp., 211 NY 125, supra; Matter of Erickson v Dilgard, 44 Misc 2d 27; Matter of Melideo, 88 Misc 2d 974; Public Health Law, §§ 2504, 2805-d; CPLR 4401-a). The current law identifies the patient’s right to determine the course of his own medical treatment as paramount to what might otherwise be the doctor’s obligation to provide needed medical care. A State which imposes civil liability on a doctor if he violates the patient’s right cannot also hold him criminally responsible if he respects that right. Thus a doctor cannot be held to have violated his legal or professional responsibilities when he honors the right of a competent adult patient to decline medical treatment.[6]
*378 The District Attorney also urges that whatever right the patient may have is entirely personal and may not be exercised by any third party once the patient becomes incompetent. He notes that although a court may appoint a guardian to manage an incompetent’s financial affairs and to supervise his person, some rights have been held to be too personal to be exercised by an incompetent’s representative (see, e.g., Mainzer v Avril, 108 Misc 230, 232; Matter of Barletta, 2 Misc 2 135, 139; Matter of Rasmussen, 147 Misc 564, 566; cf. Matter of Buttonow, 23 NY2d 385, 394; Matter of Hills, 264 NY 349, 354; 44 CJS, Insane Persons, § 49; 27 NY Jur, Incompetent Persons, § 81). He argues that a right to decline lifesaving treatment conflicts with the patient’s fundamental and constitutionally guaranteed right to life (US Const, 14th Arndt) and to permit a third party to choose between the two means, in effect, that the right to life is lost once the patient becomes incompetent. Finally he urges that if a patient’s right to decline medical treatment survives his incompetency, it must yield to the State’s overriding interest in prohibiting one person from causing the death of another, as is evidenced by the homicide laws.
The District Attorney’s arguments underscore the very sensitive nature of the question as to whether, in case of incompetency, a decision to discontinue life sustaining medical treatment may be made by some one other than the patient (see, also, Kamisar, Some Non-Religious Views Against Proposed “Mercy-Killing” Legislation, 42 Minn L Rev 969; Collester, Death, Dying and the Law: A Prosecutorial View of the Quinlan Case, 30 Rutgers L Rev 304). However, that issue is not presented in this case because here Brother Fox made the decision for himself before he became incompetent. The Supreme Court and the Appellate Division found that the evidence on this point, as well as proof of the patient’s subsequent incompetency and chances of recovery was “clear and convincing”. We agree that this *379 is the appropriate burden of proof and that the evidence in the record satisfies this standard.
Although this is a civil case in which a preponderance of the evidence is generally deemed sufficient, the District Attorney urges that the highest burden of proof beyond a reasonable doubt should be required when granting the relief may result in the patient’s death. But that burden, traditionally reserved for criminal cases where involuntary loss of liberty and possible stigmatization are at issue (Addington v Texas, 441 US 418, 428), is inappropriate in cases where the purpose of granting the relief is to give effect to an individual’s right by carrying out his stated intentions. However, we agree with the courts below that the highest standard applicable to civil cases should be required. There is more involved here than a typical dispute between private litigants over a sum of money. Where particularly important personal interests are at stake, clear and convincing evidence should be required (Addington v Texas, supra, p 424). It is constitutionally required in cases of involuntary civil commitments (Addington v Texas, supra) and we have recognized the need for the higher standard in exceptional civil matters (see, e.g., Ross v Food Specialties, 6 NY2d 336; Amend v Hurley, 293 NY 587; Porter v Commercial Cas. Ins. Co., 292 NY 176). Clear and convincing proof should also be required in cases where it is claimed that a person, now incompetent, left instructions to terminate life sustaining procedures when there is no hope of recovery. This standard serves to “impress the factfinder with the importance of the decision” (Addington v Texas, 441 US 418, 427, supra) and it “ ‘forbids relief whenever the evidence is loose, equivocal or contradictory’ ” (Backer Mgt. Corp. v Acme Quilting Co., 46 NY2d 211, 220).
In this case the proof was compelling. There was no suggestion that the witnesses who testified for the petitioner had any motive other than to see that Brother Fox’ stated wishes were respected. The finding that he carefully reflected on the subject, expressed his views and concluded not to have his life prolonged by medical means if there were no hope of recovery is supported by his religious beliefs and *380 is not inconsistent with his life of unselfish religious devotion. These were obviously solemn pronouncements and not casual remarks made at some social gathering, nor can it be said that he was too young to realize or feel the consequences of his statements (cf. Matter of Quinlan, 70 NJ 10, swpra). That this was a persistent commitment is evidenced by the fact that he reiterated the decision but two months before his final hospitalization. There was, of course, no need to speculate as to whether he would want this particular medical procedure to be discontinued under these circumstances. What occurred to him was identical to what happened in the Karen Ann Quinlan case, which had originally prompted his decision. In sum, the evidence clearly and convincingly shows that Brother Fox did not want to be maintained in a vegetative coma by use of a respirator.
II
In the Storar case, of course, we do not have any proof of that nature. John Storar was never competent at any time in his life. He was always totally incapable of understanding or making a reasoned decision about medical treatment. Thus it is unrealistic to attempt to determine whether he would want to continue potentially life prolonging treatment if he were competent. As one of the experts testified at the hearing, that would be similar to asking whether “if it snowed all summer would it then be winter?” Mentally John Storar was an infant and that is the only realistic way to assess his rights in this litigation (see Bryn, op. cit., p 24, n 107). Thus this case bears only superficial similarities to Eichner and the determination must proceed from different principles.
A parent or guardian has a right to consent to medical treatment on behalf of an infant (Public Health Law, § 2504, subd 2). The parent, however, may not deprive a child of lifesaving treatment, however well intentioned (Matter of Sampson, 29 NY2d 900; Matter of Vasko, 238 App Div 128; Matter of Santos v Goldstein, 16 AD2d 755, mot for lv to app dsmd 12 NY2d 642; cf. Matter of Hofbauer, 47 NY2d 648). Even when the parents’ decision to decline *381 necessary treatment is based on constitutional grounds, such as religious beliefs, it must yield to the State’s interests, as parens patriae, in protecting the health and welfare of the child (Matter of Sampson, supra; Jehovah’s Witnesses v King County Hosp. Unit, 390 US 598, affg 278 F Supp 488; People ex rel. Wallace v Labrenz, 411 Ill 618, cert den 344 US 824; Power of Public Authorities to Order Medical Care for A Child Over Objection of Parent or Guardian, Ann., 30 ALR 2d 1138; cf. Prince v Massachusetts, 321 US 158). Of course it is not for the courts to determine the most “effective” treatment when the parents have chosen among reasonable alternatives (Matter of Hofbauer, 47 NY2d 648, supra). But the courts may not permit a parent to deny a child all treatment for a condition which threatens his life (compare Custody of A Minor, 375 Mass 733, with Matter of Hofbauer, supra, p 656). The case of a child who may bleed to death because of the parents’ refusal to authorize a blood transfusion presents the classic example (Jehovah’s Witnesses v King County Hosp., supra; Matter of Sampson, supra).
In the Storar case there is the additional complication of two threats to his life. There was cancer of the bladder which was incurable and would in all probability claim his life. There was also the related loss of blood which posed the risk of an earlier death, but which, at least at the time of the hearing, could be replaced by transfusions. Thus, as one of the experts noted, the transfusions were analogous to food — they would not cure the cancer, but they could eliminate the risk of death from another treatable cause. Of course, John Storar did not like them, as might be expected of one with an infant’s mentality. But the evidence convincingly shows that the transfusions did not involve excessive pain[7] and that without them his mental and physical abilities would not be maintained at the usual level. With the transfusions on the other hand, he was essentially the same as he was before except of course he had a fatal illness which would ultimately claim his life. Thus, *382 on the record, we have concluded that the application for permission to continue the transfusions should have been granted. Although we understand and respect his mother’s despair, as we respect the beliefs of those who oppose transfusions on religious grounds, a court should not in the circumstances of this case allow an incompetent patient to bleed to death because someone, even someone as close as a parent or sibling, feels that this is best for one with an incurable disease.
In conclusion we note that it has been suggested by the District Attorney in the Eichner case that these applications do not present a justifiable controversy; that they call for innovations in the law, both substantive and procedural, which should be left to the Legislature, subject only to review by the courts for compliance with constitutional requirements (see, also, Matter of President & Directors of Georgetown Coll., 3 F2d 1000, 1010, 1015 [Burger, J., dissenting]; Sharpe & Hargest, Lifesaving Treatment for Unwilling Patients, 36 Fordham L Rev 695; Note, 77 Harv L Rev 1539). We, of course, cannot alter statutory responsibility but we can declare the rights and obligations of the parties under existing law. In fact the District Attorney does not contend that the courts can never rule upon the legality of such activities but suggests that the courts should wait for the parties to act before considering whether there is any civil or criminal liability. However, responsible parties who wish to comply with the law, in cases where the legal consequences of the contemplated action is uncertain, need not act at their peril (New York Public Interest Research Group v Carey, 42 NY2d 527, 530). Nor is it inappropriate for those charged with the care of incompetent persons to apply to the courts for a ruling on the propriety of conduct which might seriously affect their charges.
We emphasize, however, that any such procedure is optional. Neither the common law nor existing statutes require persons generally to seek prior court assessment of conduct which may subject them to civil and criminal liability. If it is desirable to enlarge the role of the courts in cases involving discontinuance of life sustaining treatment *383 for incompetents by establishing, as the Appellate Division suggested in the Eichner case, a mandatory procedure of successive approvals by physicians, hospital personnel, relatives and the courts, the change should come from the Legislature.
Accordingly, the order of the Appellate Division should be reversed, without costs, in the Storar case and modified, without costs, in the Eichner case by deleting everything but the authorization to the petitioner to discontinue use of the respirator.

. Brother Fox died after the case had been argued at the Appellate Division but before the decision had been handed down. John Storar died after the case had been argued in this court. *370 We also note that certain types of actions abate upon the death of a party (1 Am Jur 2d, Abatement Survival and Revival, § 75). The reason for the rule is lost in antiquity (1935 Report of NY Law Rev Comm, pp 157, 159, 176-179) and in modern times the rule itself has been abrogated by statute, except in a few cases (see, e.g., EPTL 11-3.2, 11-3.3; People v Mintz, 20 NY2d 753). In the absence of any reason or controlling precedent to the contrary we have concluded that the problems posed by the death of the patients in these particular cases are properly resolved by consideration of the principles applicable to moot controversies (cf. People v Smith, 44 NY2d 613, 617).

. The need for judicial restraint in this area is illustrated by the dissent which has abstractly endorsed the right of third parties, at least family members, to adopt a course of “passive euthanasia” with respect to fatally ill incompetent patients, although it is not necessary to reach that issue, on the facts of these cases. Presumably this right could only be exercised by family members, thus imposing a “restriction” which itself is open-ended, reaching to the limits of the family tree. We also assume that despite the blanket indorsement, the dissenter realizes the potential abuses involved in that concept and that because of that danger, the propriety of applying that concept can only be assessed in the context of a particular case.

. In response to the dissent we note that as a matter of public policy a medical facility generally has no responsibility or right to supervise or interfere with the course of treatments recommended by the patient’s private physician, even when the patient is incapable of consent due to age (Florentino *374 v Wenger, 19 NY2d 407). That would be a matter to be decided by the private physician with the patient’s family and the hospital would have no power to intervene or standing to sue.
In this respect this case is unusual because John Storar did not have a personal physician. His medical care was provided by various physicians assigned by the State facility where he resided. Thus under the peculiar facts of this case the center’s concern for potential liability was real, at least insofar as it related to its role as treating physician. In other words here the center’s status was more than that of a hospital which generally would lack sufficient interest to warrant any court relief.

. The attending physicians recognized that it was possible that at some *375 point the rate of blood loss might increase to such an extent that transfusions would be completely ineffective. At the time of the hearing, however, the rate had remained relatively constant.

. The court observed that “He remains alert to his environment, and he apparently recognizes the presence of others * * * He recognizes his attending day nurse, and pulls down his pajama bottoms when it is time for administration of his medicine.”

. In other cases the State may be able to assert additional interests, such *378 as, prevention of suicide or, perhaps, protection of minor children or dependents. Those concerns are inapplicable here. Brother Pox’ condition was not self-inflicted (see, e.g., Bryn, op. dt., pp 16-24) and he has no children or dependents.

. Whether the presence or absence of excessive pain would be determinative with respect to the continuation of a life sustaining measure need not be reached under the facts of this case.