## CIRCUIT COURT OF FAIRFAX COUNTY

Harriet Louise Hazelton
by Lloyd Hazelton,
Guardian ad Litem

v.

Powhatan Nursing Home, Inc.

August 29, 1986

Case No. (Chancery) 98287

By JUDGE THOMAS A. FORTKORT

On August 20, 1986, the husband of Harriet Louise Hazelton, Dr. Lloyd Hazelton and two of her children, Mary Hazelton Wills and Elaine Hazelton Bolton, met with Mrs. Hazelton's attending physician, Dr. Robert L. Guillaudeu. Dr. Guillaudeu informed the husband and children that the condition of Mrs. Hazelton had deteriorated to the point that she was unconscious and in a comatose state that was irreversible. With the consent of Dr. Guillaudeu and pursuant to the Virginia Natural Death Act, the husband and children directed that the nasogastric tube be removed from Mrs. Hazelton by the Powhatan Nursing Home. The Nursing Home refused to remove the tube, and on August 21, 1986, counsel for the family filed a Bill of Complaint for Temporary Injunction, Declaratory Judgment, and other appropriate relief under the Virginia Natural Death Act. The Court appointed counsel to represent Mrs. Hazelton as guardian ad litem and set the case for a hearing on the petition on August 27, 1986.

The Powhatan Nursing Home filed an answer denying that Mrs. Hazelton's condition met the requirements of Virginia Code Section 54-325.8:2 and 54-325.8:6. Further, they alleged that Mrs. Hazelton was suffering from a

terminal condition as defined in Section 54-325.8:3 of the Virginia Code and denied that the nasogastric tube was a life-prolonging procedure as defined in Section 54-325.8:2. Powhatan Nursing Home also requested a Declaratory Judgment and asked that the petition be dismissed.

The guardian ad litem filed a general denial requesting strict proof of the allegations in the petition.

On August 27, 1986, testimony was taken from the husband, Dr. Hazelton, the attending physician, Dr. Guillaudeu, and the consulting physician, Dr. O'Brien testified. This testimony was not recorded. The defendants and the guardian ad litem requested a day's delay to permit their medical experts to testify. The Court granted the motion to continue and on August 28, 1986, Dr. Nelson Podolnick and Dr. Robert Comunale, Nursing Supervisor Betty W. Leith, and Staff Social Worker Emily Johnson testified for the defendant. This testimony was recorded.

The first indication of Mrs. Hazelton's condition occurred in March, 1986. At that time, Dr. Hazelton and Mrs. Hazelton were attending a convention in New Orleans when Mrs. Hazelton suddenly lost consciousness. She was originally taken to Tulane University Hospital where diagnostic tests were made. She returned to Virginia and was placed in Fairfax Hospital where a malignant brain tumor was diagnosed. Doctors at Fairfax Hospital determined that the tumor was inoperable. Mrs. Hazelton received extensive radiation treatments. The third choice of chemotherapy was contraindicated by her doctors. The radiation treatments proved unsuccessful and finally all active treatment of the tumor ceased.

Mrs. Hazelton was medicated for pain and to prevent seizures and other sequellae from her condition and, ultimately, in July was transferred by ambulance from Fairfax Hospital to the Powhatan Nursing Home.

At the time of her arrival at the Nursing Home, Mrs. Hazelton was weak but able to communicate. Her ability to swallow was hampered, and she had been hardly eating at all. Dr. Guillaudeu decided to place a nasogastric tube into Mrs. Hazelton to allow intake of nourishment and medication. He prescribed some pain medication, dilantin to prevent seizures, another medication to slow the tumor buildup and some medicine to aid cardio-vascular regularity.

On August 9 or 10, Mrs. Hazelton lapsed into a coma. Four days later, Dr. Guillaudeu added morphine to her

regimen. Mrs. Hazelton is now totally non-responsive. Her vital signs remain steady and her current life expectancy is from one to two months, although she might survive several months.

Dr. Lloyd Hazelton, a respected pharmacologist, and the founder of Hazelton Laboratories in this community, has been married to Harriet Louise Hazelton for 47 years. Dr. Hazelton stated that he, his wife, and his children had discussed the prolongation of life by artificial means and had decided as a family policy that no family members would wish to continue artificial life support after all hope of recovery was gone.

All four doctors agree that Mrs. Hazelton is suffering from a fatal disease, i.e. a non-operable malignant brain tumor, that she will not regain consciousness and removal of the nasogastric tube will result in her death in three to ten days from the lack of nourishment and dehydration. With the tube in place, and continued care and medication, she will die when the tumor causes vital brain functions to cease. Dr. Comunale also opined that a massive infection was also probable with patients in Mrs. Hazelton's condition and that such infection would be terminal.

The expert witnesses differed with each other over two major points. The defense witnesses felt that removal of the nasogastric tube would make it difficult to medicate Mrs. Hazelton and control her pain. Dr. Guillaudeu, the attending physician, felt that Mrs. Hazelton was unable to feel any paid due to her comatose state and that morphine could be introduced intermuscularily.

Dr. Comunale also stated that in his opinion the use of a nasogastric tube was not an extraordinary medical procedure.

Another major difference among the expert witnesses was that Dr. O'Brien and Dr. Guillaudeu felt that death was imminent and Dr. Podolnick and Dr. Comunale felt that death was not imminent.

This latter difference is a legal rather than a medical question that the Court must decide by applying the Natural Death Act to the facts in this case.

Section 54-325.8:6 of the Virginia Code allows life-prolonging procedures to be withheld or withdrawn from an adult patient with a terminal condition who (i) is comatose. . . (ii) has not made a declaration in accordance with this article, provided there is consultation and agreement for the withholding or withdrawal of life-

prolonging procedures between the attending physician and any of the following individuals. . . (3) the patient's spouse.

Harriet Louise Hazelton is comatose, her attending physician, and her spouse have consulted and are determined to withhold further life-prolonging treatment.

*Terminal Condition* is defined in Section 54-325.8:2 as "a condition caused by injury, disease or illness from which to a reasonable degree of medical certainty (i) there can be no recovery and (ii) death is imminent."

All four medical experts have stated Mrs. Hazelton has an inoperable malignant brain tumor from which there can be no recovery. The experts cannot agree as to whether death is imminent. All expect death to occur from one to three months but also state Mrs. Hazelton could survive several months under her present regimen.

*Imminent* is defined by *Black's Law Dictionary*, Fifth Edition, as "near at hand, mediate rather than immediate, close rather than touching, impending, on the point of happening, threatening, menacing, perilous."

Mrs. Hazelton's condition gives definition to the word imminent. She is afflicted with a terminal illness that in less than six months has reduced her from a normally functioning person to a comatose state within a few months of death according to all four medical experts.

To state that her death is not "imminent" would be to define that word as immediate, at once, within a day. Not only is that an erroneous definition of the word but it also destroys the intent of the statute. There is no need for intervention by removing life support systems for those for whom death is only hours away.

For those who are in a coma but are not afflicted with a disease or other condition that will certainly lead to their death, the statute will not apply.

It is precisely people like Harriet Hazelton who lie between life and death, enjoying nothing of the sweetness of life, while her body slowly gives up its remaining functions to the advance of the brain tumor, whom the legislature seeks to protect from the indignity of the artificial prolongation of life.

*Life-prolonging procedure* is defined in Virginia Code Section 54-325.8:2 as any medical procedure, treatment or intervention which (i) utilize mechanical or other artificial means to sustain, restore or supplant a spontaneous vital function or is otherwise of such a nature

as to afford a patient no reasonable expectation of recovery from a terminal condition and (ii) when applied to a patient in a terminal condition would serve only to prolong the dying process; however, nothing in this act shall prohibit the administration of medication or the performance of any medical procedure deemed necessary to provide comfort, care, or alleviate pain.

The insertion of a nasogastric tube is an artificial means to overcome the inability of the patient to swallow and to be given nourishment and hydration. Dr. Comunale testified in his opinion the procedure was not an extraordinary medical procedure. The definition in our Code does not require the procedure to be extraordinary, merely artificial. Nevertheless, the inquiry does not end there because House Document 32 which gives the intent of the General Assembly uses the words extraordinary, life-prolonging procedures.

In the letter of the Attorney General to Delegate Agee, the definition of extraordinary medical procedures is discussed. An excerpt from that letter follows:

> House Document No. 32 refers to "extraordinary" life-prolonging procedures when discussing the subcommittee's intent. Absent some indication to the contrary, the subcommittee's intent can, in my judgment, be construed to be evidence of the General Assembly's intent. With this intent in mind, and giving the words of the statute their ordinary meaning, I am of the opinion that the use of oxygen and of intravenous feeding, as these terms are defined above, are not "extraordinary." In the limited purpose described above, the provision of oxygen and intravenous feeding does not primarily sustain, restore or supplant a spontaneous vital function but provides comfort, care, or alleviation of pain to the individual patient. Accordingly, under those circumstances, a physician would not be permitted under the Act to terminate the procedures. A different result would undoubtedly follow if oxygen were administered by different means for the purpose of supplanting the spontaneous function of breathing; similarly, a different result would undoubtedly follow if intravenous feeding was not for the purpose

of providing comfort against dehydration but was mainly for the purpose of supplanting the spontaneous functions of receiving necessary nourishment into the body in amounts adequate to maintain life. In both situations, of course, before terminating the procedure, it would be necessary for the physician first to find that the patient was in a terminal condition and that the process served *only* to prolong the dying process.

The nasogastric tube supplants the spontaneous function of supplying Mrs. Hazelton with nourishment. In her comatose condition, she is unable to receive nourishment any other way. Numerous cases discuss the various methods of providing nourishment to a patient. The nasogastric tube is probably the simplest medical procedure for those patients who can tolerate it. I have found no case which forbids the removal of the nasogastric tube because it is not considered an extraordinary medical procedure. In the case of *Conroy* (citation below) the attending nurse stated that the nasogastric tube was not an extraordinary medical procedure. In reporting that comment, the Court later found no compelling reason or logic to distinguish what extraordinary or ordinary life-extending processes might be.

Extraordinary is used often in literature about natural death but it is probably incapable of precise definition. As stated by the Attorney General's opinion, what may be ordinary medical procedures at one point in time may become extraordinary as the patient's condition changes and the function of the artificial device becomes life sustaining rather than an ancillary aid to the patient's overall treatment regimen.

Courts in the exercise of the duty of the State to protect life have ordered blood transfusions, normally considered an extraordinary medical procedure, to patients who on religious grounds refuse permission to doctors to employ the procedure. Extraordinary medical procedures then can be ordered where they are necessary to restore the patient to good health. Ordinary medical procedures which in the particular patient case are needlessly extending life are terminated as "burdensome."

Natural death cases focus on the patient's wishes, the right to refuse treatment, the condition of the patient

and what treatment goals various medical procedures are expected to produce but there is simply no body of law which divides treatment processes between ordinary or extraordinary procedures. The patient's prospect for recovery and his current level of consciousness are surer guides in determining whether or not a life-prolonging medical procedure can be terminated.

*In the matter of Clare Conroy*, 486 A.2d 1209, cited by the defendants, the New Jersey Court denied a request to remove a nasogastric tube from an 84-year-old bedridden woman with serious and irreversible physical and mental impairments and a limited life expectancy. The *Conroy* case exhaustively covers the various medical, legal and moral judgments that necessarily go into a decision to terminate life support systems. New Jersey is also the jurisdiction of the case of *In re Quinlan*, 355 A.2d 647. In that case, the Court permitted the removal of a respirator from a 22-year-old woman who was in a comatose or vegetative state, chronic and persistent, not subject to change through a long series of medical procedures. In Ms. Quinlan's case, the cause of the coma was uncertain. The Court distinguished its ruling in *Conroy* from *Quinlan* because Quinlan was comatose while Conroy was awake and conscious and able to interact with her environment to a limited extent. As Mrs. Hazelton no longer has any contact with her environment, the *Conroy* case is factually distinguishable from her case.

The New York Court in *In Re Stotar*, 420 N.E.2d 64, denied permission to remove life-prolonging measures unless the patient expressed a wish when competent not to receive such measures. A companion case *In Re Eichner*, 420 N.E.2d 64, upheld the permission to remove life support systems where there was clear and convincing evidence that it was the desire of the patient not to have his life prolonged by artificial means.

While I do not feel that a Virginia Court would follow this New York precedent because our statute provides for a surrogate to make a treatment decision for the patient under certain prescribed decisions, it is worth pointing out that the evidence in the case at bar is that Mrs. Hazelton did not wish her life to be prolonged by artificial means. Whether one applies the law of consent to the case at bar, or substantiated judgment analysis which allows incompetent persons the same right to choose

or reject medical treatment that is allowed competent persons, the result is the same.

The actions taken by the petitioners in this case meet the criteria of our statute, and the spouse has the right to invoke the clearly expressed wishes of his terminally ill wife not to have her life prolonged by artificial means.

There remains one more problem to be addressed. The legislation distinguishes between life-prolonging procedures and treatment necessary to provide comfort. There is apparently no medical ethical standards that would guide us in attempting to distinguish between pain control and life-prolonging measures. Indeed, in this case the medical experts are divided. The attending physician is confident his patient feels no pain in her comatose state. One of the other doctors said that no positive conclusion as to whether Mrs. Hazelton is in any pain would be drawn unless she was placed on an electroencephalogram and pain was induced to see if there was a reaction. This procedure could not be utilized in the nursing home.

The original Natural Death Act which stated that life-prolonging procedures did not include comfort care was amended. Under the amendment, withdrawal of comfort care is not expressly forbidden. If the surrogate requests comfort care to be withheld, a physician may comply with the request. The surrogate cannot override the physician's determination to continue comfort care. No standards are given which define the term "comfort care" or to distinguish comfort care from life sustaining procedures.

In our case, removal of the nasogastric tube will make medication difficult but not impossible. The attending physicians can utilize other procedures during the relatively short period of time that Mrs. Hazelton would be maintained between the removal of the nasogastric tube and her demise. The Court believes that the concern of the Legislature for care and comfort of this terminal patient can be safely left in the hands of her attending physician with the provision that medication for pain be continued to the moment of death.

The Court finds that the provisions of the Natural Death Act have been complied with and the attending physician's order to remove the nasogastric tube should be complied with by the nursing home.