*844 OPINION OF THE COURT
Denis R. Hurley, J.
INTRODUCTION
By order to show cause returnable on July 24, 1987, the petitioner, in his capacity as acting executive director of Pilgrim Psychiatric Center (hereinafter Hospital), seeks an order authorizing a "modified radical mastectomy of the left breast” to be performed on Shirley C., a patient at the facility. That request is opposed by the patient’s daughter, Sonia Schwartz. Mrs. Schwartz was granted intervenor status in the proceeding with the consent of the Assistant Attorney-General, representing the Hospital, and the Mental Health Information Service lawyer-guardian ad litem, representing Mrs. C.
The basis for Mrs. Schwartz’s opposition is that a more conservative, less mutilating form of treatment should be afforded to her mother than the modified radical mastectomy requested by the Hospital, viz., a lumpectomy followed by radiation treatment.
Initially, it must be emphasized that Mrs. Schwartz is not the guardian ad litem for her mother, nor is she in a position to dictate the medical treatment to be provided in this case. The question before this court is whether the petitioner Hospital has established that the requested modified radical mastectomy is necessary, and in the best interest of the patient. However as an intervenor, Mrs. Schwartz had the right to call witnesses to the stand, cross-examine the witnesses called by others, and otherwise fully participate in the court proceeding, as she has done.
FACTS
Mrs. C. is 81 years of age, and has been hospitalized for mental illness for more than 40 years.
In April of this year, a mass was detected in her left breast. It was felt by the Hospital — correctly as all parties to the present action concede — that Mrs. C’s. mental illness rendered her incapable of providing, or withholding consent to the needed medical procedures. Accordingly, her daughter’s permission was sought for a biopsy and, if necessary, for a modified radical mastectomy which, of course, would have involved the removal of her mother’s breast. That permission was not given. Rather, aúthorization was provided for an excisional biopsy of the tumor, which was done on June 26, *845 1987. Malignancy was found, and the Hospital thereafter commenced the present action.
A number of doctors testified at the hearing, including Elliot Grossman, M.D., a consulting surgeon to the Pilgrim Psychiatric Center who was called by the Hospital, and Leonard Kessler, M.D., an, inter alia, board certified oncologist, who testified on behalf of Mrs. Schwartz’s position.
It is unnecessary to detail the considerable medical evidence in the record, for the areas of disagreement are few.
Doctors Grossman and Kessler agree that the two alternative medical procedures under discussion (viz., modified radical mastectomy, and lumpectomy followed by radiation treatment) are: (1) equally effective for her type of cancer which is in the earliest, or stage 1 (a) clinical phase (2) both conventional in the sense of being routinely performed and accepted in the medical profession and (3) comparable "cost wise” to the extent that factor may legitimately be included in the equation in this case. Both procedures would involve an auxiliary nodes dissection, conducted in an effort to determine whether the malignancy has metastasized.
Both procedures have "pluses” and "minuses”. A modified radical mastectomy would entail the loss of a breast, but would not involve follow-up radiation treatment for this patient. The alternate procedure would leave the breast essentially intact, but would require radiation therapy for 15 minutes a day over the course of six weeks. The uncontroverted testimony of Doctor Kessler described the resulting side effects from radiation as probably minimal, consisting of a slight loss of appetite, possible mild nausea and possible thickening of the radiated tissue.
The pivotal area of disagreement is whether Mrs. C. is an appropriate candidate for radiation therapy. She suffers from Parkinson’s disease and from tardive dyskinesia. Is she capable of keeping her chest area sufficiently still so that radiation may be administered?
Doctor Grossman testified that he observed Mrs. C. suffer almost continuous tremors while she was lying on a table for a 15-minute period on August 24, 1987, in presence of himself and Doctor Diamond. More importantly, he reported to the court that Doctor Diamond, who is the radiologist who would normally service a patient such as Mrs. C. from the Pilgrim Psychiatric Center, has indicated that he will not do so in this case regardless of the results of the present proceeding.
*846 Unfortunately, Doctor Diamond did not testify. Doctor Grossman, who is a surgeon rather than a radiologist, did not know for what part of the 15 sessions a patient must remain still. Doctor Kessler, the oncologist who had a one-year residency in radiology, indicated that the period is between 45 seconds and 1 minute if a linear accelerator is used. Doctor Kessler also observed that Mrs. C. recently underwent a bone scan which required her to remain relatively still for a period of 45 to 60 minutes, although neither he nor Doctor Grossman knew exactly how still.
Doctor Kessler further testified that the patient’s dual affliction of Parkinson’s disease and tardive dyskinesia involve tremors of the extremities, not the trunk and chest area which would be subject to radiation in this case. In his judgment — based on his experience, review of the records furnished to him and his one-hour examination of the patient —Mrs. C. is an appropriate candidate for radiation therapy. He opined that even if she ultimately proves not to be— contrary to his expectation — the more conservative treatment should be tried prior to removing her breast.
Parenthetically, it is clear that the modified radical mastectomy would be less burdensome to the Hospital caretaker, due to the reduced need for follow-up care, and the posture taken by Doctor Diamond of Central General Hospital which facility provides for most — but not all — of the surgical needs of patients at Pilgrim Psychiatric Center.
And finally by way of a review of the facts, the evidence of the patient’s self-awareness will be considered. If she is incapable of appreciating the presence, or absence, of her breast, the present discussion would be academic. In that regard, Mrs. Schwartz testified that her mother has a sense of self-awareness. For instance, Mrs. C. has insisted on putting on a brassiere, altering her hairstyle and wearing stockings before leaving the Hospital grounds with her family members. Doctor Kessler similarly voiced the opinion that Mrs. C. possesses self-awareness. Although she failed to answer most of his questions during her visit tó his office on August 10th, she did tell him: "I don’t want my breast cut off”. Perhaps this was simply a meaningless utterance by a mentally ill person. Her guardian ad litem reports that Mrs. C. does not want "anything” done so, she argued, little, if any, weight should be given to the statement.
*847 APPLICABLE LAW
The intervener, Sonia Schwartz, argues that she is entitled to elect the type of treatment to be afforded to her mother, assuming that the choice is medically reasonable. In support of that proposition, two cases are cited, viz., Matter of Hofbauer (47 NY2d 648 [1979]) and Matter of Storar (52 NY2d 363 [1981]).
In Matter of Hofbauer (supra), the question was whether the parents of a minor child with Hodgkin’s disease could properly be charged with neglect under article 10 of the Family Court Act when they did not heed the attending physician’s advice calling for radiation and chemotherapy treatment, but rather elected a less conventional mode of treatment. The Court of Appeals concluded that it would not disturb the conclusions reached by the courts below that a neglect charge did not properly lie, given the fact that the alternative, less conventional treatments were given by duly licensed physicians and seemed to stabilize the boy’s condition. There is little in Hofbauer — which is premised in large part on the axiom "that every parent has a fundamental right to rear its child” (supra, at 655) — to aid the court with the issue at bar.
Similarly, the Storar holdings are at best of marginal relevance. The first of the two cases consolidated in the Storar appeal involved an 83-year-old, terminally ill, comatose patient. Before becoming incompetent due to his illness, he had repeatedly voiced the view that he would not want to have his life sustained under such circumstances via artificial life support systems. In approving his guardian ad litem’s application to discontinue the use of a respirator, the lower courts noted, and Court of Appeals reiterated, and attached great weight to, the patient’s prior statements that his life not be maintained in such manner. Certainly, that case sheds little light on the issue before me. The second case within the Storar appeal involved a severely retarded, and terminally ill adult who needed frequent blood transfusions to maintain life. His mother refused to grant permission for the transfusions, causing the director of the Newark Development Center, a State facility where the patient resided, to seek a court order authorizing the transfusions. The Court of Appeals reversed the lower courts which had found for the mother, concluding that the parent’s wishes should be overridden and the transfusions given. The parent’s position under such circumstances "must yield to the State’s interests, as parens patriae, in *848 protecting the health and welfare of the child”. (Supra, 52 NY2d, at 381.)
In sum, the court concludes that neither Matter of Hofbauer nor Matter of Storar (supra) serves as authority for the intervenor’s argument that she has the right to elect which of the two alternate treatments previously discussed should be administered to her mother.
Since Mrs. Schwartz has refused to authorize the requested modified radical mastectomy, the court has been asked to do so. The nature of my function is found in the following excerpt from Matter of Strauss (56 AD2d 570-571 [2d Dept 1977]): "Persons committed to State institutions for the mentally ill are wards of the court, 'upon which a duty devolves of protection both as to their persons and property’ * * * Where the record shows the clear necessity for surgery * * * the court is fully empowered to grant authorization therefor, especially where there is no close relative who is in the position to give consent.”
Since Mrs. C. is a ward of the court, my responsibility is to determine whether the proposed surgery is necessary and in her best interest. The Hospital, as the petitioner, bears the burden of proof.*
QUESTIONS PRESENTED
Clearly, Mrs. C. requires treatment. Since it is conceded that the two alternate procedures would be equally effective, should not the Hospital’s application to perform a modified radical mastectomy be granted? To answer that question, two subsidiary issues must be addressed: (1) has the Hospital met its burden of proof by establishing that Mrs. C. is not a likely candidate for the less mutilating procedure of lumpectomy, with radiation and (2) even if it has not, does it make any difference if the more radical approach is followed, given the patient’s advanced age and mental condition?
DISCUSSION
As to whether Mrs. C. is an appropriate candidate for radiation therapy, Doctor Diamond did not testify. His brief *849 report, which is in evidence, is conclusory in nature and of little aid to the court. Doctor Grossman’s testimony was unconvincing on this pivotal point since he has no idea of the time frame during which Mrs. C. would have to remain stationary during the 15-minute daily sessions.
Doctor Kessler’s testimony, on the other hand, indicates that she would probably be able to participate in such treatment. He testified that her trunk, rather than her extremities, must remain still for radiation to be administered, and that the period of time would not exceed 60 seconds a session if a linear accelerator were used. His point on her recent taking of a bone scan was also highly significant to the court. Mrs. Schwartz’s testimony about her mother’s tremors dovetails with Doctor Kessler’s, and again indicates that radiation therapy should at least be tried. In conclusion, the Hospital has failed to establish that Mrs. C. is an inappropriate candidate for radiation therapy. The evidence is, at best, inconclusive.
Nonetheless, the question of the patient’s ability to undergo radiation therapy is irrelevant if the loss of her breast would not adversely affect her mental well-being.
The court believes, based primarily on the testimony of Mrs. Schwartz as previously outlined, that Mrs. C. has a sense of self-awareness. Moreover, I will take judicial notice of the fact that most individuals suffer emotional trauma from the loss of any body part, whether it be a finger, an ear, a testicle or a breast. This is true — although the degree of trauma may vary —whether the person be 8 or 80, male or female. There is insufficient evidence before me to permit the conclusion that Mrs. C. who has already suffered so greatly in her life as a victim of mental illness, will not experience further anguish should her breast be removed.
CONCLUSION
For the reasons above stated, I hereby deny the Hospital’s application to perform a modified radical mastectomy.
The tumor has already been removed from Mrs. C.’s left breast. Doctor Kessler testified that if the cancer spread from that site, it probably did so prior to the detection of the mass in April of 1987. Nonetheless, prompt follow-up action is required at this point. The court disagrees — given the unique facts in this case — with the Assistant Attorney-General’s position that my sole function is to either grant or deny the *850 Hospital’s application. Here, all agree that 1 of 2 modes of treatment should be employed. The Hospital. has failed to establish that the more invasive, mutilating procedure is the only viable option.
The Hospital has invoked the jurisdiction of the court, and I occupy the role of parens patriae to Mrs. C. Accordingly, I am directing the Hospital as part of this proceeding to bring the patient to the University Hospital of the State of New York at Stony Brook, or a like State facility, for evaluation, and hopefully for radiation therapy, forthwith. Should any substantive problems develop, the guardian ad litem, the intervenor, or the Hospital may reopen this case for the taking of additional evidence upon 48 hours’ prior notice to me, and the other parties to the proceeding.

 Arguably, the standard of proof is "clear and convincing”. (Matter of Storar, 52 NY2d 363, 379.) However, even if the lesser standard of "fair preponderance” is employed, the Hospital’s evidence, as shall be explained subsequently, falls short of the mark.