*966 OPINION OF THE COURT
Barbara R Potter, J.
Petitions filed July 1, 2008, by petitioner, St. Lawrence County Department of Social Services (hereinafter DSS), against respondents, Gideon H. and Barbara H., allege that the child, E.H. (born 2007) is a neglected child and that they are the persons legally responsible for his care and for that neglect. Notice was given to respondents pursuant to section 1036 of the Family Court Act. The matters came on for preliminary proceedings July 3, 2008. Respondents were advised of their rights to counsel, to free counsel, and to an adjournment to obtain counsel. Petitioner appeared through its counsel, David Wilier, Esq.; respondent, Gideon H., appeared with his counsel, William Galvin, Esq.; respondent, Barbara H., appeared with her counsel, Richard Gardner, Esq.; and the child’s law guardian, A. Michael Gebo, Esq., was present throughout the proceedings. Respondents denied the allegations of the petitions, and the matters duly came on for a fact-finding hearing on September 19, 2008, and continued on October 3 and October 22, 2008. The court heard closing arguments at the end of the hearing and reserved decision.
The petition alleges that E.H. is a neglected child pursuant to Family Court Act § 1012 which defines a neglected child as
“a child less than eighteen years of age (i) whose physical . . . condition has been impaired or is in imminent danger of being impaired as a result of the failure of his parent ... to exercise a minimum degree of care (A) in supplying the child with adequate . . . medical, dental, optometrical or surgical care, though financially able to do so or offered financial or other reasonable means to do so” (Family Ct Act § 1012 [f]).
The DSS alleges E.H.
“was born with a hole between the lower chambers of his heart, and with a severe blockage between his right ventricle and his pulmonary artery. A shunt was surgically inserted between his aorta and his pulmonary artery to increase the blood flow to his lungs. The shunt is now not large enough for his growing body.”
E.H.’s physicians have advised respondents that the shunt has to be replaced because it is not large enough, and the hole in his heart has to be repaired or he will die in early childhood. Respondents have refused to consent to the surgery.
*967 During the trial, the court heard from the DSS’s two expert medical witnesses, Frank Smith, M.D., a licensed pediatric cardiologist, and George Michael Alfieris, M.D., a licensed pediatric cardiothoracic surgeon. Each doctor has treated E.H. and each was a credible witness. E.H. was diagnosed with tetralogy of fallot with pulmonic atresia after he presented at Canton-Potsdam Hospital as “very blue” at two weeks of age. Dr. Smith estimated he has treated approximately 150 children with this diagnosis. Dr. Smith explained in great detail, with diagrams, E.H.’s first operation where a shunt was inserted from his body artery to his lung artery; there also was a repair to connect the two lung arteries (transcript at 63). He explained how E.H.’s heart looks now and will look after the proposed surgery, and he compared it with a normal heart (see petitioner’s exhibits 3 [A], 3 [B], 3 [C]). In Dr. Smith’s opinion, E.H.’s
“prognosis is poor . . . but as he grows, the — he’ll outgrow the shunt. I would say within the next year there’s up to a seventy-five percent chance that he will die of this. ... As the oxygen level goes down, and his blood count goes up, he would be at risk for things like a stroke which would mean loss of circulation to a part of his brain that would render him with neurological nervous system deficits. I think that would be the major risk other than death” (transcript at 51).
As the shunt becomes too small, it will clot up when the blood becomes thicker, and E.H.’s body will produce more blood cells to compensate for the lack of oxygen thereby exacerbating the problem. Dr. Smith testified that in years past the shunt would have been replaced with a bigger one, but that method is no longer the accepted standard of care in the medical profession. Now, the standard of care for someone with E.H.’s diagnosis is to repair the hole and the blockage. He referred to it as a “complete repair.” Dr. Smith testified that he examined E.H. in December 2007. At that time, he had an oxygen saturation level of 85%. In February 2008 — the last time he examined him — it was between 79% and 84%. He explained that the number regarding E.H.’s oxygen saturation level could fluctuate depending on numerous factors including E.H.’s level of activity at the time of the exam or whether he was cold. His level of oxygen saturation was determined through a pulse oximeter and not by checking his red blood cells, which would be more accurate, because it is important to limit the amount of blood drawn. It is Dr. Smith’s belief that the longer E.H. is without the “complete *968 repair” surgery, the bluer he will become (oxygen saturation level decreases), and the more risky the operation becomes. He testified “[t]he risk of stroke right around the time of the operation, during the anesthesia and whatnot, could go up” (transcript at 52).
Respondents consented to E.H.’s first operation which was performed by Dr. Alfieris. During his testimony, he explained the mechanics of the “complete repair” surgery. It involves opening the chest, using a cardiopulmonary bypass machine, which would bypass blood from the heart and lungs. Once a patient is on the bypass machine it cools the body and organs. A large dose of potassium chloride is given to the patient which then paralyzes the heart, but the “heart does not die.” Dr. Alfieris concurred with Dr. Smith’s opinion that without the operation, E.H. will ultimately die, and that the complete repair surgery is the only accepted standard of practice. All of the medical professionals treating E.H. believe he is ready for the “complete repair” surgery because as he is outgrowing the shunt, there is a constant decline in saturation and concomitant increase in his red blood cells which decreases his level of saturization and causes an increase in his hemoglobin (see transcript at 268). In addition, the lower the oxygen level saturization is at the time of the operation, the more risky it becomes that E.H. might die during the operation. According to Dr. Alfieris, if E.H. is operated on before his oxygen level saturization drops below 70% his chance of survival is between 90% and 95%.
The DSS also called Eric Lynch, a child protective case worker with the St. Lawrence County Department of Social Services. Mr. Lynch testified that he interviewed respondent, Gideon H., on June 23, 2008, concerning E.H.’s need for further surgery. During his interview, respondent, Gideon H., indicated he did not consent to E.H.’s surgery because he believes it involves “the stopping and starting” of his heart which is against his religious beliefs. Mr. H. told Mr. Lynch it was a “family decision” and would “call in” both sets of grandparents.
Respondents’ bishop, Elmer Miller, also testified during the proceeding. He was elected the bishop of respondents’ church in May 2007. Mr. Miller explained that his and respondents’ religious beliefs permit the church’s members to receive medical care including surgery, but it does not permit the type of open heart surgery that E.H. requires “because it stops the heart.”
Gideon H. testified on his own behalf. He testified that E.H. was taken to the hospital at two weeks of age because the *969 parents noticed he was bluish. He was transferred to Upstate Medical Center in Syracuse, New York, where he stayed for 9 to 10 days. Gideon H. stated that he was informed in April 2008 that E.H. needed another operation, and that his heart would be “stopped” during the surgery. Respondents object to the surgery because it is against their religious beliefs. Gideon H. testified that he believes that “stopping the heart” is too close to taking chances of killing E.H. Both Dr. Smith and Dr. Alfieris testified that the heart will not be “stopped.” Dr. Smith testified the heart would be “slowed” and Dr. Alfieris testified it would be “paralyzed.” Gideon H., however, does not want to “put[ ] him down where we think it’s too close to taking chances of killing him” (transcript at 291). He quoted scripture from the New and Old Testament for his beliefs including “Let the little children come to me and do not forbid them for of such is the kingdom of heaven” (petitioner’s exhibit RA quoting the Book of Matthew, ch 19, verse 14; Book of Mark, ch 10, verse 14; Book of Luke, ch 18, verse 16). He believes the “Good Lord looks deeply in our heart . . . God said T have found David the Son of Jesse a man after my own heart, who will do all my will.’ Now we know God sees in our heart and we think the heart is our livespirit” (id.). He also was concerned with the possibility that E.H. might need a pacemaker after the surgery (a risk of the surgery) since that device also is against his religious beliefs. Gideon H. testified that E.H. has regular checkups with Dr. Weisman, a pediatrician located in Malone, New York. Prior to his seeing Dr. Weisman, E.H. had been in the care of Dr. Szoke, a pediatrician in Potsdam, New York, for approximately one year. And while respondents offered, and the court received Dr. Weisman’s records into evidence, there is no suggestion that there is any viable alternative treatment available to save E.H.’s life, and respondents presented no other evidence to support any such idea.
Respondents are members of the Schwartzentruber Amish community. This sect of the Amish community has a strict adherence to beliefs according to the Holy Bible. It is very conservative and obeys rules of its ancestors. Professor Karen Johnson-Weiner, the chair of the Anthropology Department of State University of New York — Potsdam, testified regarding respondents’ belief system. Her specialty is the maintenance of language in a multicultural society and derives from her “participant observation” in people’s homes and talking about their lives (transcript at 168). She explained there are *970 three churches in this area (commonly referred to as the north country) which follow the Mose Miller branch of Schwartzentruber Amish. She stated the Amish are “always in church. Everything about Amish life is a reflection of their beliefs” (transcript at 170). Their faith is a lived faith not intellectual. She further stated that they follow an Ordnung which is “the church discipline. It’s — it’s the — guidelines that — that church members have — have determined to help them live life according to the scripture, according to religious belief’ (transcript at 164). She said to do other than follow those guidelines could cause a problem for the respondents, and they could be excluded, or banned from the community until they made a confession and made things right with the church again. However, Gideon H., when asked by counsel, “what kind of trouble would you be with your religion if you were to let that operation happen on Judge Potter’s order?” responded “as far as trouble, I don’t know would I be in trouble. It probably would bother my conscience . . . But as far as having trouble in — with the community and so forth, I wouldn’t have trouble I don’t think” (transcript at 296-297). When asked by his counsel whether E.H. “would have any trouble with your congregation if Judge Potter ordered him to have operation and he had it,” Gideon H. responded, “No, because he’s — he’s an infant” (transcript at 297).
Every parent has the fundamental right to raise his/her child. That right, however, is “not absolute inasmuch as the State, as parens patriae, may intervene to ensure that a child’s health or welfare is not being seriously jeopardized by a parent’s fault or omission” (.Matter of Hofbauer, 47 NY2d 648, 655 [1979] [citations omitted]). The statute defining a neglected child provides that a parent must exercise a “minimum degree of care in supplying the child with adequate . . . medical . . . care” {id. at 654, quoting Family Ct Act § 1012 [¶] [i] [A]). The Court of Appeals reiterated in Nicholson v Scoppetta (3 NY3d 357 [2004]) that “ ‘[M]inimum degree of care’ is a ‘baseline of proper care for children that all parents, regardless of lifestyle or social or economic position, must meet’ . . . Notably, the statutory test is ‘minimum degree of care’ — not maximum, not best, not ideal — and the failure must be actual, not threatened” {Nicholson, 3 NY3d at 370, citing Hofbauer, 47 NY2d 648 [1979]).
“[T]he most significant factor in determining whether a child is being deprived of adequate medical care, and thus, a neglected *971 child ... is whether the parents have provided an acceptable course of medical treatment for their child in light of all the surrounding circumstances” (Hofbauer, 47 NY2d at 655). A court must afford great deference to a parent’s choice of medical care and providers, but it “may not permit a parent to deny a child all treatment for a condition which threatens his life” (Matter of Storar, 52 NY2d 363, 381 [1981]). The court’s inquiry does not end there. It must determine
“whether the parents, once having sought accredited medical assistance and having been made aware of the seriousness of their child’s affliction and the possibility of a cure if a certain mode of treatment is undertaken, have provided for their child a treatment which is recommended by their physician and which has not been totally rejected by all responsible medical authority” (Hofbauer, 47 NY2d at 656; see also Matter of Terrence E, 38 AD3d 254 [3d Dept 2007]).
Finally, “[t]o find medical neglect, there must be a determination that the parent did not seek or accept medical care, and that such failure placed the child in imminent danger of becoming impaired” (Matter of Shawndel M., 33 AD3d 1006, 1006 [2d Dept 2006], citing Matter of Faridah W., 180 AD2d 451 [1992]).
Hofbauer involved a child diagnosed with Hodgkin’s disease. The parents decided to follow an alternative treatment and were charged with neglect. There was a difference of opinion as to the effectiveness of the alternative treatment, but the father never ruled out “conventional treatment” if the boy’s condition worsened. The alternative treatment was being administered by a New York State licensed physician. In that case, the parents were not found to be neglectful because the Court determined “we are unable to conclude, as a matter of law, that Joseph’s parents have not undertaken reasonable efforts to ensure that acceptable medical treatment is being provided to their child” (Hofbauer, 47 NY2d at 657). This case is a situation unlike Hofbauer because E.H. is not receiving an alternative acceptable treatment because there is no other alternative treatment. Instead, the respondents have chosen no treatment for their child other than checkups with Dr. Weisman.
Here, respondents did seek medical attention for their son when they noticed he was blue. Respondents are loving, caring parents with strong religious beliefs. Although respondents *972 initially sought medical attention for E.H., and consented to the original surgery, they later refused the current life-saving surgery for him on the basis of their religious beliefs. Respondent, Gideon H., testified that he understands this court can order the surgery, but he does not understand how it can be done when America is “not found that way — they have religious grounds.” While the court respects respondents’ rights to exercise their religious beliefs, it has a duty as “parens patriae” to ensure E.H.’s health and safety. The court credits Dr. Smith’s testimony when he stated there are no generally accepted medical treatments for E.H.’s medical condition other than the “complete repair” surgery.
Here, there is an imminent risk to the child’s health if he does not receive the “complete repair” surgery. This harm is not threatened, but actual, since E.H.’s oxygen saturation levels have already decreased. Dr. Smith testified that if E.H. does not have the surgery within the next year “there’s up to a seventy-five percent chance that he will die of this” (transcript at 51). Dr. Alfieris testified
“by prolonging the surgery farther and farther out, there is more opportunity for an adverse event to occur. And if we were to allow [E.H.] to go to three or fours years of age ... by four years of age [E.H.] will have had another illness or something else that would have happened, which would have precipitated the shunt to — to clot off or thrombos and— and [E.H.] to die” (transcript at 285).
This court finds by a preponderance of the evidence that E.H. is a child whose physical condition is in imminent danger of being impaired as a result of the failure of his parents to exercise a minimum degree of care in supplying him with adequate medical care. DSS failed to provide any evidence whatsoever of respondents’ ability to pay for the surgery or any offer for the agency to pay for it. If the respondents are unable to pay for the surgery, Medicaid will be responsible to pay for the life-saving surgery. Albeit DSS’s failure to offer any proof on this issue, the court makes a finding without that proof because of the imminent risk to E.H.’s health.
Now, therefore, upon the findings made herein, it is adjudged that facts sufficient to sustain the petition herein have been established in that respondents have refused to provide the only accepted medical treatment for their son, E.H., which consists of a “complete repair” of his heart in order to save his life; and is hereby adjudged that the above-named child is a neglected *973 child as defined in section 1012 of the Family Court Act by Gideon H. and Barbara EL; and it is ordered that the child is released to the custody of his respondent parents, such release to be under the supervision of the St. Lawrence County Department of Social Services.